THIRD DIVISION
September 12, 2007

No. 1-05-3038


| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| AARON BENNETT, | ) | Honorable |
| | ) | Lawrence Terrell, |
| Defendant-Appellant. | ) | Judge Presiding. |


PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Aaron Bennett was found guilty of first degree murder and sentenced to 60 years in prison. On appeal, defendant contends that: (1) the circuit court erred in denying his motion to quash his arrest and suppress evidence; (2) the circuit court erred in denying his motion to suppress his statements; and (3) the circuit court erred in barring his expert from presenting testimony regarding defendant's interrogative suggestibility or, alternatively, in failing to conduct a hearing to assess whether the expert's testing was accepted within the field for purposes of admissibility. For the following reasons, we affirm.

## I. BACKGROUND

Defendant was arrested and subsequently indicted on four counts of first degree murder in connection with the shooting death of Shawn Alexander on November 18, 2002, in Maywood, Illinois. Prior to trial, defendant filed a motion to quash his arrest and suppress evidence alleging that the arresting officer had acted without an arrest warrant, or without probable cause that defendant had committed or was about to commit a crime.

At the hearing on that motion, Maywood police officer Arian Wade testified that on November 18, 2002, he was on patrol in a marked squad car in Maywood, Illinois. At about 6:50 p.m., Officer Wade testified that he was in the area of Eighth Avenue and Pine Street when he received a radio transmission stating that there was a "man down" in the Auto Zone parking lot, located at 710 South 5th Avenue. Officer Wade testified that the transmission also stated that "the offender" was running southbound on 6th Avenue and that he was a black male wearing a black "hoodie." As Officer Wade drove toward the area, he received a second transmission stating that the offender went northbound on 6th Avenue away from the Auto Zone. Officer Wade made a "U-turn" at 6th Avenue and Washington Street, and began driving northbound on 6th Avenue.

Officer Wade testified that as he was driving, he saw a black male wearing a black hoodie run across 6th Avenue and continue running westbound on Pine Street. Officer Wade testified that approximately one or two minutes had passed between the time he heard the radio transmissions and when he saw the individual run across 6th Avenue. Officer Wade identified defendant as the individual that he saw run across 6th Avenue. Officer Wade testified that after

seeing defendant, he drove up to defendant and asked defendant to walk over to the squad car. Officer Wade exited the squad car, placed his hand on defendant's chest, and felt that defendant had a rapid heart beat. Defendant then stated, "I didn't shoot anybody." Officer Wade asked defendant what he was talking about, then defendant did not say anything.

Officer Wade testified that he placed defendant in the back of the squad car and drove to the Auto Zone parking lot, which was two blocks from where he located defendant. When Officer Wade pulled into the parking lot, Darryl Watson approached the squad car, pointed to the back of the vehicle where defendant was seated, and stated "That is the one who did this." Officer Wade then learned that Watson was referring to defendant as the individual who shot the victim, Alexander, in the Auto Zone parking lot.

Following arguments on the motion, the circuit court found that Officer Wade acted reasonably based upon the information that he had when he stopped defendant, whom Officer Wade found running in the area and matching the description provided by the radio transmission. While the court noted that the description of a "black male with a black hoodie" was not unusual, the court found that there was probable cause and denied defendant's motion to quash his arrest and suppress evidence.

Prior to trial, defendant also filed a motion to suppress any and all oral or written communications, confessions, statements, or admissions, whether inculpatory or exculpatory, made by the defendant prior to, at the time of, and subsequent to his arrest. In that motion, defendant stated that he was arrested at about 7 p.m. on November 18, 2002, but not brought before a magistrate for a probable cause hearing until 9:30 a.m., on November 22, 2002.

Defendant noted that an incriminating statement was elicited from him about 60 hours into his detention. Defendant argued that this delay violated his right to a probable cause determination by a judicial officer within 48 hours of a warrantless arrest.

At the hearing on defendant's motion to suppress, transcripts from prior hearings were admitted into evidence, including from defendant's motion to quash his arrest and suppress evidence, motion to suppress a lineup identification, and motion to suppress defendant's videotaped confession. The transcripts included the testimony of Officer Wade, previously described. The transcripts also included the testimony of Darryl Watson, who testified that on November 18, 2002, he accompanied his nephew, Alexander, to the Auto Zone, where they obtained a tool to fix a headlight on Alexander's vehicle. While Alexander was fixing the headlight, Watson saw a black male wearing a "Blackhawks jogging suit" approach Alexander from behind and shoot Alexander. The police were called to the scene and Watson testified that he provided police with a description of the shooter and his attire. While at the scene, a second squad car arrived with an individual in the vehicle. Watson testified that he approached the second squad car, saw defendant inside the vehicle, and identified defendant as the shooter. Watson testified that he later identified defendant in a police lineup.

Sergeant James Robinson testified that on November 18, 2002, he was involved in the homicide investigation, in which Alexander was shot in the parking lot of the Auto Zone. Sergeant Robinson testified that just after 7 p.m., Officer Retwell brought defendant into the police station. Sergeant Robinson testified that he immediately realized that defendant had not been read his Miranda rights. Sergeant Robinson testified that he immediately obtained a Miranda

rights form, read the form to defendant, and obtained defendant's signature. Sergeant Robinson and Officer Retwell signed the form as witnesses. Sergeant Robinson testified that defendant indicated that he understood his rights and that he would waive his <u>Miranda</u> rights and talk to the police. Sergeant Robinson testified that defendant did not state that he wanted to remain silent or that he wanted an attorney present.

Assistant State's Attorney (ASA) Rob Sparano testified that just before midnight on November 18, 2002, he arrived at the Maywood police station. ASA Sparano and Detective Fortenberry interviewed defendant. Prior to the interview, ASA Sparano read defendant his <u>Miranda</u> rights from a preprinted form. Defendant indicated that he understood his rights, that he agreed to waive those rights, and that he wished to speak with ASA Sparano. Defendant signed the preprinted form indicating that he understood his rights, and included the time and date on the form. ASA Sparano and Detective Fortenberry also signed the form as witnesses. ASA Sparano testified that during the interview, defendant was always responsive to his questions and never indicated that he had any trouble understanding questions. ASA Sparano asked defendant what school he attended, and defendant stated that he attended Pace School. ASA Sparano testified that he was not familiar with Pace School.

Detective Randy Brown testified that at about 4 p.m., on November 19, 2002, he interviewed defendant. After defendant acknowledged and waived his <u>Miranda</u> rights, defendant told Detective Brown that he had been present at the time of the shooting at Auto Zone. Defendant stated that he observed Jerome Gill shoot the victim. Detective Brown indicated that at the time he interviewed defendant, defendant had been in custody for less than 24 hours.

1-05-3038

Detective Brown testified that police officers began looking for Gill and located him on the evening of November 20, 2002. On the following day, November 21, 2002, a police lineup was conducted, which included both Gill and defendant. Watson viewed the lineup and identified defendant as the shooter.

Prior to the police lineup, ASA Margaret Menzenberger was summoned to the police station on the evening of November 19, 2002. ASA Menzenberger testified that at about 9:30 p.m., she and Detective Fortenberry met with defendant. ASA Menzenberger advised defendant of his Miranda rights, using the same form that ASA Sparano had previously used. Defendant acknowledged his signature on the preprinted form and his initials after each of the rights listed on the form. Defendant indicated that he understood his rights and that he agreed to waive those rights and talk to ASA Menzenberger. ASA Menzenberger spoke with defendant for about 30 to 40 minutes. ASA Menzenberger testified that she did not attempt to determine defendant's educational level and did not ask him if he could read or write. ASA Menzenberger testified that defendant never appeared unresponsive or unable to understand questions, and defendant was very cooperative and talkative.

After the police lineup, ASA Christopher Bemben was summoned to the police station. ASA Bemben testified that he and Detective Brown met with defendant at the police station between 4 and 4:45 p.m., on November 21, 2002. ASA Bemben advised defendant of his Miranda rights, using a preprinted form, and had defendant read the rights aloud. Defendant indicated that he understood his rights and wished to waive them. ASA Bemben spoke with defendant for 30 to 60 minutes. Defendant stated that he had been treated fine, that he had been

allowed to eat, sleep, and use the restroom. ASA Bemben presented defendant with options to memorialize his statement and defendant agreed to have his statement videotaped and signed a consent form to that effect. In the videotaped statement, defendant admitted taking a gun from the closet of his bedroom, approaching Alexander and shooting Alexander in the head. Defendant was presented to the court for a probable cause hearing on November 22, 2002. Dr. Jonathan Kelley, a forensic psychiatrist employed by Forensic Clinical Services for the circuit court of Cook County, testified that he evaluated defendant to assess his ability to understand Miranda rights and his ability to read and understand written waivers and verbal conversations pursuant to a court order. Dr. Kelley testified that his opinion was that defendant was able to understand Miranda rights and would have been able to understand a verbal recitation of his Miranda rights, but likely would not have been able to understand written waivers. Dr. Kelley testified that an earlier report by another forensic psychiatrist, Dr. Timothy Cummings, indicated that defendant tested at the third-grade level for reading and arithmetic abilities and defendant's ability to spell words was similar to the performance of a second-grade student. Dr. Cumming's report also indicated that defendant's range of intellectual potential was at about the third percentile when compared to his peers and that defendant's IQ was about 72. Dr. Kelley testified that he was familiar with the Gudjonsson Suggestibility Scale (GSS) tests. Dr. Kelley testified that the GSS tests related to an assessment of suggestibility and voluntariness. Dr. Kelley testified that his understanding was that when the request is made to address the ability to understand Miranda rights, it applies to the cognitive, knowing and intelligent understanding, rather than the volitional or voluntariness component. Dr. Kelley did not recall ever being asked to examine an individual on the volitional

1-05-3038

component and had no opinion on the GSS tests.

Dr. Bruce Frumkin was called as a witness by defendant and the State objected, indicating that Dr. Frumkin's testimony would be going beyond the knowing and intelligent waiver issue, and would instead offer an opinion on defendant's suggestibility. The State requested an evidentiary hearing, pursuant to Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), prior to Dr. Frumkin's testimony regarding the GSS tests administered to defendant and defendant's suggestibility. The circuit court allowed Dr. Frumkin's testimony, over the State's objection.

Dr. Frumkin testified that defendant was learning disabled and attended an alternative high school, Pace High School, for his learning disability. Dr. Frumkin testified that defendant tested in the lower two to three percentile range compared to other people his age, and that defendant is very deficient in verbal intelligence. Dr. Frumkin testified that it would be unlikely that, at the time he was questioned, defendant would have fully understood his Miranda rights. Dr. Frumkin testified that there were psychological factors that may be relevant in the court's determination regarding the voluntariness of the Miranda waiver, but that he did not believe it was appropriate for a psychologist to conclude that a waiver was voluntary or involuntary. Dr. Frumkin also administered the GSS tests on suggestibility to defendant and concluded that defendant was in the 99 percentile range in terms of interrogative suggestibility. Dr. Frumkin described the GSS tests as consisting of presenting the patient with a fact pattern and then questioning the patient regarding the fact pattern. Some questions presented to the patient are designed to be misleading and the test first evaluates how many times the patient yields to the misleading information. The second stage of the test involves confronting the patient, challenging his answers, and again

-8-

evaluating how many times the patient yields under pressure.

Following the hearing on defendant's motion to suppress any and all oral or written communications, confessions, statements, or admissions, the circuit court denied defendant's motion. The court found that defendant's statements were voluntary and noted that defendant was 18 years old at the time of his arrest, he had received food and was allowed to sleep, and defendant was not questioned for extended periods of time. The court also noted that the testimony at the hearings indicated that defendant was advised of his <u>Miranda</u> rights and never expressed any resistance to continuing to speak to the police. There was also no evidence that defendant was abused or mistreated by the police. The court noted that defendant gave a different version of events which prompted the police to investigate the leads given to them by defendant. The court found that the delay in presenting defendant for a probable cause hearing was to follow up on this information that defendant provided to the police. The court further noted that defendant was willing to cooperate in the ongoing dialogue with the police and began talking with the police immediately after having been advised of and waiving his <u>Miranda</u> rights. The court concluded that the delay in presenting defendant for a probable cause hearing did not change the voluntary nature of defendant's statements.

Finally, the State filed a motion *in limine* to preclude Dr. Frumkin from testifying at trial regarding his assessment of defendant's interrogative suggestibility. The State argued that the tests utilized by Dr. Frumkin and the theories he espoused have been rejected by the scientific community as unreliable and not valid. Alternatively, the State requested that the matter be set for a <u>Frye</u> hearing where the court could hear from employees of the Forensic Clinical Services,

who would testify that they and the scientific community have rejected the assessing of suggestibility.

Defendant filed a motion to strike the State's motion *in limine* and their motion for a Frye hearing. Defendant argued that Dr. Frumkin testified at a pretrial motion in this case and presented expert testimony in three other cases. Defendant also maintained that the State had not presented any credible evidence that the suggestibility theory was not credible or acceptable under Frye.

Following a hearing, the circuit court stated that the key issue was whether the expert testimony would aid the trier of fact in reaching its conclusion. The court denied defendant's motion to strike the State's motion *in limine* and ordered a Frye hearing on the issue of the admissibility of the expert testimony. Defendant then filed a motion to reconsider the order for a Frye hearing, which the circuit court denied.

Defendant then motioned the case up to reset the date for the Frye hearing. At that time, the court stated that it had reviewed the ruling on the motion *in limine* to preclude Dr. Frumkin from testifying about defendant's suggestibility and reversed its previous ruling. The court granted the State's motion *in limine* and stated:

"The defense is barred from introducing evidence through Dr. Frumkin ***

regarding his assessment of the defendant's interrogative suggestibility; however,

the defense may comment upon the evidence during the voir dire, opening

statements, trial and closing arguments."

The court also stated that the trier of fact could rely on its own common sense and life experience

without expert testimony in determining the issue of suggestibility. The court did not conduct a Frye hearing and Dr. Frumkin did not testify at trial.

At trial, the State presented the testimony of three eyewitnesses. Watson testified that on November 18, 2002, he accompanied his nephew, Alexander, to Auto Zone. After obtaining a tool, Alexander began to fix the front headlight on his vehicle in the Auto Zone parking lot. Watson testified that the owner of the vehicle parked next to Alexander's vehicle, Andre Poe, held a flashlight and Watson stood between the two cars. Watson testified that a man, wearing a black hoodie sweatshirt, ran up to them in the parking lot and shot Alexander in the head. Watson testified that he ran after the shooter, then returned to the parking lot. Watson testified that a squad car arrived at the parking lot with defendant in the backseat, and Watson identified him as the shooter. Watson also testified that he identified defendant as the shooter in a police lineup. Poe provided similar testimony, but he did not make an identification. Lee Williams, who was parked in the Auto Zone parking lot at the time of the shooting, also testified to a similar version of events, but did not make an identification of the shooter.

Officer Wade, ASA Sparano, ASA Menzenberger and ASA Bemben testified in conformity with their earlier testimony at the various pretrial hearings. The State also presented defendant's videotaped statement, in which defendant admitted taking a gun from the closet of his bedroom, approaching Alexander and shooting Alexander in the head.

Defendant's mother, Robin Bennett, and stepfather, Tommy Lee Scott, Jr., testified that defendant attended Pace High School, which was an alternative school for individuals with learning and behavior disabilities. Robin and Scott testified that on November 18, 2002, they

heard police cars arrive at the Auto Zone, which was across the street from their home. Robin and Scott testified that they saw defendant be taken into custody by the police and made repeated attempts to talk to him at the police station, but were rebuffed by the police.

Following closing arguments, the jury found defendant guilty of first degree murder and defendant was sentenced as described above. This timely appeal followed.

## II.  ANALYSIS

### A.  Defendant's Motion to Quash Arrest and Suppress Evidence

Defendant first contends that the circuit court erred in denying his motion to quash arrest and suppress evidence where the arresting officer lacked probable cause to effectuate an arrest at the time the officer stopped defendant.

Review of a trial court's ruling on a motion to quash arrest and suppress evidence presents mixed questions of fact and law. People v Novakowski, 368 Ill. App. 3d 637, 640 (2006). "The trial court's factual and credibility determinations are accorded great deference, and we reverse only if the findings are against the manifest weight of the evidence." Novakowski, 368 Ill. App. 3d at 640. "Legal conclusions, however, are reviewed *de novo*." Novakowski, 368 Ill. App. 3d at 640. "Therefore, we review the ultimate determination of whether the evidence should have been suppressed *de novo*." Novakowski, 368 Ill. App. 3d at 640.

Defendant asserts that his arrest occurred on the street when defendant was initially stopped by Officer Wade, handcuffed, placed in the back of the squad car, and transferred to the scene of the shooting. Defendant argues that, at trial, the State's arguments also operated on the assumption that defendant was arrested when stopped by Officer Wade. Defendant therefore

maintains that the State waived any argument that the Officer Wade properly stopped defendant pursuant to Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889 , 88 S. Ct. 1868 (1968), on reasonable suspicion that he was the person who had just committed the crime and then arrested him minutes later when the witness positively identified him.  However, defendant acknowledges that waiver is a limitation on a party's ability to raise an issue, not on this court's right to entertain it.  See People v. Magee, No. 1-05-2646, slip op. at 12 (June 29, 2007), citing People v. Thomas, 354 Ill. App. 3d 868, 883 (2004).  We may also affirm the circuit court on any basis supported by the record.  People v. Dinelli, 217 Ill. 2d 387, 403 (2005).  We therefore first consider whether the police had reasonable suspicion to justify an initial Terry stop and whether police exceeded the bounds of a Terry stop and placed defendant under arrest without probable cause.

Under Terry v. Ohio, where a police officer observes unusual conduct, he may stop and detain a person without probable cause to investigate possible criminal activity.  Terry v. Ohio, 392 U.S. at 30,  20 L. Ed. 2d at 911, 88 S. Ct. at 1884-85.  To justify a Terry stop, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."  Terry v. Ohio, 392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.  Illinois has codified the holding of Terry in section 107-14 of the Code: "[A] peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions."  725 ILCS 5/107-14 (West 2000). "We apply a *de novo* standard of review to determine the existence of 'reasonable suspicion' supporting a Terry

1-05-3038

stop." <u>People v. Ross</u>, 317 Ill. App. 3d 26, 29 (2000).

Here, Officer Wade had received a radio transmission that there was a "man down" in the Auto Zone parking lot. The "offender" was described as a black male wearing a black hoodie, who was seen running northbound on 6th Avenue. A few minutes later, Officer Wade observed defendant, who matched that description, running down 6th Avenue. These facts provided at least the minimal articulable suspicion required to stop defendant. <u>Ross</u>, 317 Ill. App. 3d at 30 (reasonable suspicion can be derived from officer seeing the defendant, who matched the description of the offender, within minutes of the crime walking a short distance from the crime scene); see also <u>People v. Young</u>, 306 Ill. App. 3d 350, 353 (1999) (validating <u>Terry</u> stop based upon a telephone tip from the shooting victim's home that the shooter was seen driving around the victim's neighborhood in a grey "police style" Chevy with a black male passenger, and officers located a grey "police style" Chevy with two black men in the front seat less than a block from the victim's house almost immediately thereafter). Therefore, we conclude that the investigatory stop was proper.

Defendant argues that Officer Wade could not have possessed a reasonable suspicion of criminal activity because he did not know that an offense had occurred, he was not aware that there was a shooting until after defendant was seized, and the radio transmission did not mention a gun or indicate that there was a shooting. Contrary to defendant's assertions, the evidence showed that Officer Wade was aware that a criminal offense had occurred prior to observing defendant in the area near the crime scene. Officer Wade received a radio transmission that there was a "man down" and a description of "the offender" and the direction in which the offender was

-14-

seen running. While the radio transmission did not specify that the offense was a shooting, Officer Wade knew that an offense had occurred and, as previously discussed, Officer Wade had sufficient information to stop defendant and conduct a brief investigation into his identity.

Defendant also argues that where Officer Wade relied entirely on the radio transmission, the State was required to present evidence regarding who notified police of the offense and provided the description of the offender that was transmitted. However, defendant did not present this argument before the circuit court, and arguments made for the first time on appeal are waived. People v. Brooks, 187 Ill. 2d 91, 128 (1999).

We next consider whether Officer Wade exceeded the bounds of a Terry stop and placed defendant under arrest before the eyewitness identified defendant. Defendant asserts that Officer Wade effected an arrest by handcuffing him, placing him in the backseat of the squad car and transporting him to a showup at the crime scene. Defendant has not disputed that probable cause to arrest existed when the eyewitness positively identified defendant as the shooter.

Under Terry, a police officer is specifically permitted to briefly detain an individual to investigate the possibility of criminal behavior absent probable cause to arrest. Young, 306 Ill. App. 3d at 354. "An investigatory stop is distinguished from an arrest based on the length of detention and the scope of investigation following the initial stop, not the initial restraint of movement." Ross, 317 Ill. App. 3d at 30, citing Young, 306 Ill. App. 3d at 354. "The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration." Ross, 317 Ill. App. 3d at 30.

In this case, neither the length of detention nor the scope of the investigation transformed the lawful investigatory stop into an arrest. Within minutes of receiving a radio transmission describing the offender and the direction in which he was running, Officer Wade stopped defendant, who matched that description, in the area of the crime scene. Officer Wade placed defendant in the back of the squad car and drove to the Auto Zone parking lot, which was two blocks from where he located defendant. When Officer Wade pulled into the parking lot, the witness, Watson, approached the squad car and identified defendant as the shooter. Because the length of defendant's detention was brief and limited to making a quick determination as to defendant's involvement in the shooting, the investigatory restraint was not transformed into an arrest. See Ross, 317 Ill. App. 3d at 30-31 (an eight-minute time lapse between when the police effectuated the defendant's stop and the time of arrest after the victim positively identified the defendant comported with the permissible scope of a Terry stop); see also Young, 306 Ill. App. 3d at 354 (a less-than-five-minute detention of the defendant that was limited to obtaining an immediate identification of the defendant by the victim did not rise to the level of an arrest).

In addition, the transportation of defendant to the crime scene for the purpose of obtaining an immediate identification of defendant by the eyewitness did not convert the investigatory stop into an arrest in this case. Our supreme court has determined that the transportation of a suspect for the purpose of an identification is not necessarily an unreasonable seizure under the fourth amendment. People v. Lippert, 89 Ill. 2d 171, 181-82 (1982). In Lippert, the supreme court held that after the defendant's arrest in a sparsely populated rural area late at night, the transportation of the defendant a short distance for the purpose of a showup was "a legitimate investigatory

1-05-3038

procedure even if one considers the grounds to have been less than probable cause to arrest." Lippert, 89 Ill. 2d at 181-82.

More recently, in Ross, this court held that the transportation of the defendant to the scene of the crime for a showup was permissible because it was minimally intrusive when compared to the benefit of the immediate investigation. Ross, 317 Ill. App. 3d at 31. In Ross, the transfer was to the crime scene one block from the site of the Terry stop, for an immediate identification to either inculpate or exculpate the suspect. Ross, 317 Ill. App. 3d at 31. Like Ross, the site of transfer in this case was to the crime scene for an immediate identification to either inculpate or exculpate defendant. In addition, the crime scene was only two blocks from the site of the Terry stop. Therefore, we conclude that the detention of defendant and his transportation to the crime scene was a legitimate investigatory procedure. Accordingly, we find no error in the circuit court's denial of defendant's motion to quash his arrest and suppress evidence.

### B. Defendant's Motion to Suppress Statements

Defendant next contends that the circuit court erred in denying his motion to suppress statements where his right to a prompt probable cause determination was violated. Defendant argues that because he is learning disabled, performs at a third-grade scholastic level, and was isolated from his family while in custody, he was particularly susceptible to the coercive custodial environment.

Initially, the State responds that defendant waived this argument by failing to include it in his motion for a new trial. To preserve an issue for review, defendant must object both at trial

1-05-3038

and in a written posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988). "Failure to do so operates as a waiver as to that issue on appeal." People v. Castillo, 372 Ill. App. 3d 11, 15 (2007). Here, defendant raised the issue in a pretrial motion to suppress all statements and in his motion for a new trial defendant alleged that "the court erred in denying the defendant's motion to suppress statements." The circuit court subsequently denied defendant's motion for a new trial, stating that defendant "has failed in his burden of proof that any judicial error resulted in a violation of his constitutional rights or an unjust jury verdict." "The purpose of the waiver rule is to ensure that the circuit court was given the opportunity to correct any errors before they are raised on appeal." Castillo, 372 Ill. App. 3d at 16. Here, the circuit court had the opportunity to consider defendant's arguments prior to trial and after the trial. We therefore find the issue has not been waived.

"Review of a motion to suppress presents both questions of law and fact." In re Christopher K., 217 Ill. 2d 348, 373 (2005). The trial court's credibility determinations and findings of fact will not be reversed unless they are against the manifest weight of the evidence. In re Christopher K., 217 Ill. 2d at 373. However, the ultimate legal question of whether the statements should be suppressed is reviewed *de novo*. In re Christopher K., 217 Ill. 2d at 373.

The record indicates that defendant began talking with police at the police station immediately after having been advised of his rights and waiving those rights. During that time, defendant provided a different version of events implicating another individual as the shooter. No probable cause hearing was held until approximately 86 hours had passed. Defendant argues that this delay was unreasonable and violated his constitutional right to a prompt probable cause

1-05-3038

hearing and therefore his statements should have been suppressed.

Pursuant to the fourth amendment, "a defendant arrested without a warrant is entitled to a probable cause hearing to justify any prolonged detention." People v. Macias, 371 Ill. App. 3d 632, 642 (2007). The United States Supreme Court has held that a hearing to establish probable cause within 48 hours of a defendant's warrantless arrest generally passes constitutional muster. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63 111 S. Ct. 1661, 1670 (1991). Where no hearing is held within 48 hours, the State must show some exigence or emergency circumstances justifying the delay. McLaughlin, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. However, the United States Supreme Court has not prescribed a specific remedy for the State's failure to make such a showing where a McLaughlin violation is apparent. Macias, 371 Ill. App. 3d at 642.

In the present case, defendant contends that because he was detained for 86 hours without a probable cause hearing, and because the State showed no exigence or emergency circumstances justifying the delay in conducting a hearing (resulting in a McLaughlin violation), the circuit court should have suppressed all statements made by defendant.

The Illinois Supreme Court has held that the admissibility of a defendant's statement hinges on whether it is voluntary and that defendant's prolonged detention is merely one factor to consider in determining whether an inculpatory statement was given voluntarily and should be admitted or suppressed. People v. Willis, 215 Ill. 2d 517 (2005). In assessing whether a defendant's statement was voluntary, courts consider the totality of the circumstances, including the defendant's age, intelligence, education, experience, and physical condition at the time of the

-19-

detention and interview; whether <u>Miranda</u> warnings were issued; whether the defendant suffered any physical or mental abuse; and the legality and duration of the detention. <u>Macias</u>, 371 Ill. App. 3d at 642, citing <u>Willis</u>, 215 Ill. 2d at 536.

Here, defendant argues that the circuit court failed to consider his experts' testimony that defendant was likely unable to comprehend his <u>Miranda</u> rights when presented in written form, defendant functioned at a third-grade intellectual level, and defendant was an extremely suggestible subject. Defendant, citing <u>People v. Braggs</u>, 335 Ill. App. 3d 52 (2002), *affid as modified,* 209 Ill. 2d 492 (2003), argues that based on his mental difficulties and youth, the circuit court should have applied heightened scrutiny to defendant's ability to understand his <u>Miranda</u> rights and provide statements that were not coerced or suggested. Defendant maintains that his limited intellectual level and prolonged detention with no family contact precluded a finding that his statements were voluntary.

In <u>Braggs</u>, this court found that the circuit court erred in ruling that, in the absence of police coercion or the defendant being in custody, the fact that the defendant was mentally handicapped was to be considered only as to the weight to be given her statements and not as to whether those statements were inadmissible. This court determined that the circuit court should have considered whether the defendant's statement was voluntary based on the totality of the circumstances. This court noted that where the circuit court found that the defendant was incapable of waiving her rights under <u>Miranda</u> due to her diminished mental capacity, one of the factors the court should have considered in assessing voluntariness was whether the defendant's mental retardation deprived her of the capacity to understand the meaning and effect of the

1-05-3038

confession. People v. Braggs, 335 Ill. App. 3d 52, 65 (2002). Unlike Braggs, in determining the admissibility of defendant's statements, the circuit court in this case considered whether defendant's statement was voluntary based on the totality of the circumstances. Also, the evidence did not show that defendant was incapable of waiving his Miranda rights due to his diminished mental capacity. We find that in determining that defendant's statement was voluntary, the circuit court's findings were not against the manifest weight of the evidence.

The record indicates that defendant was 18 years old at the time he was arrested and provided the statements in this case. Defendant was a student at Pace High School, which is an alternative school for individuals with learning and behavioral disabilities. Defendant had prior experience with the criminal justice system, including a conviction for delivery of a controlled substance and possession of cannabis in which defendant received probation, and two separate convictions for possession of cannabis, in which defendant was sentenced to 14 and 30 days in jail. The record also shows that defendant's conversations with detectives and ASA Sparano, ASA Menzenberger and ASA Bemben did not last for inordinate amounts of time. The police or prosecutor also began each interview by reading to defendant Miranda warnings and receiving from the defendant an acknowledgment and waiver of his rights. In one interview, defendant indicated his rights and read them back to the prosecutor. ASA Bemben's testimony also indicated that defendant informed him that he had been treated fine and that he had been allowed to eat, sleep, and use the restroom throughout his time in custody. When he was arrested defendant was apparently in good physical condition and there is no evidence of physical or mental abuse against defendant. While there was testimony that defendant likely was unable to

-21-

understand his <u>Miranda</u> rights in written form and that defendant was susceptible to suggestibility, the evidence did not show that defendant was incapable of waiving his rights under <u>Miranda</u> due to his learning level or suggestibility, unlike the defendant in <u>Braggs</u>. Rather, Dr. Kelley testified that his opinion was that defendant was able to understand <u>Miranda</u> rights, and defendant was read his <u>Miranda</u> rights and acknowledgment and waived those rights prior to each interview. Defendant's answers to police and prosecution questions indicated that he was responsive and that he had no trouble understanding questions. We find that these factors outweigh the duration of defendant's detention.

We also find this case analogous to this court's holding in <u>People v. Sterling</u>, 357 Ill. App. 3d 235 (2005). In <u>Sterling</u>, the defendant in a murder case was held in police custody for 96 hours before the State conducted a probable cause hearing. During that time, the defendant made several voluntary statements to police. Those statements provided different versions of events and circumstances surrounding the murder. The police investigated each lead provided by the defendant and found they were unsubstantiated, and the defendant eventually gave a statement implicating himself in the murder. <u>Sterling</u>, 357 Ill. App. 3d at 249-50. The defendant was convicted and sentenced to an extended prison term. On appeal, this court rejected the defendant's argument that he was denied the effective assistance of counsel when his trial attorney failed to file a motion to suppress his statement on the grounds that his lengthy detention without a probable cause hearing was unlawful. This court found that the defendant had given his inculpatory statements voluntarily within 24 hours of arrest and that a motion to suppress would not have been successful. <u>Sterling</u>, 357 Ill. App. 3d at 252-53.

Similarly, in People v. Woodard, 367 Ill. App. 3d 304 (2006), the defendant was convicted of first degree murder and solicitation to commit murder. On appeal, the defendant argued that she was unlawfully detained for nearly 80 hours without a probable cause hearing where no extraordinary circumstances existed to prevent the State from conducting such a proceeding, and that her trial counsel was ineffective for failing to file a motion to suppress her statements. In rejecting the defendant's argument, this court noted that the defendant began offering voluntary statements to detectives soon after she arrived at the police station and that those statements indicated her detailed knowledge of the circumstances involving the murder. This court found that the defendant's changing stories and dead-end leads provided to the police "only perpetuated her own detention, as they necessitated further investigation and only increased the detectives' suspicion of her involvement in the murder." Woodard, 367 Ill. App. 3d at 315.

The facts in this case warrant a similar conclusion. Defendant was arrested at about 7 p.m. on November 18, 2002, and defendant began talking to police and prosecutors immediately after having been advised of his rights and waiving those rights. At about 4 p.m., on November 19, 2002, less than 24 hours after defendant was taken into custody, defendant admitted that he was present at the shooting but identified an individual named Jerome Gill as the shooter. Defendant's lead necessitated further investigation by police, who located Gill on the evening of November 20, 2002. On the following day, November 21, 2002, a police lineup was conducted, which included both Gill and defendant, and an eyewitness identified defendant as the shooter. Based on this record, we conclude that where defendant was in lawful custody, had waived his Miranda rights, and was willing to continue talking to police, the police were not required to

1-05-3038

interrupt an ongoing dialog with defendant.  See People v. Nicholas, 218 Ill. 2d 104, 120 (2005).

### C.  The State's Motion *In Limine*

Defendant lastly contends that the circuit court erred in granting the State's motion *in limine* to preclude defense expert Dr. Frumkin from testifying about defendant's interrogative suggestibility.  Defendant argues that Dr. Frumkin's testimony was relevant, not a matter within the common knowledge of the lay juror, and reflected accepted scientific or technical principles. In the alternative, defendant argues that the circuit court erred by failing to conduct a Frye hearing to determine whether the interrogative suggestibility test conducted by Dr. Frumkin was accepted within the scientific field and, therefore, admissible in this case.

"Motions *in limine* are addressed to the trial court's inherent power to admit or exclude evidence" and, "generally, a reviewing court will not disturb the trial court's ruling absent an abuse of discretion."  People v. Voit, 355 Ill. App. 3d 1015, 1023 (2004).   "An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view."  Voit, 355 Ill. App. 3d at 1023.

Even though the circuit court here denied defendant's motion to suppress his statements, including his confession, finding it voluntary, defendant still had the right to present evidence relevant to the credibility or weight of the confession.  People v. Wood, 341 Ill. App. 3d 599, 608 (2003), citing People v. Gilliam, 172 Ill. 2d 484, 512-13 (1996).  However, "the admission of evidence remains within the [sound] discretion of the trial court and will not be reversed absent an abuse of discretion."  Wood, 341 Ill. App. 3d at 608.  Expert testimony is proper where such

-24-

testimony is needed to explain matters beyond the common knowledge of ordinary citizens, and where such testimony will aid the fact finder in reaching its conclusion. Wood, 341 Ill. App. 3d 599.

In this case, the circuit court held that the portion of Dr. Frumkin's testimony regarding his assessment of defendant's interrogative suggestibility was not beyond the common knowledge of lay persons and would not aid the trier of fact in reaching its conclusion. The court permitted defendant to comment upon the evidence during *voir dire*, opening statements, trial and closing arguments, and stated that the trier of fact could rely on its own common sense and experience in life without expert testimony in determining the issue of suggestibility. Defendant has not shown an abuse of discretion in excluding the expert testimony in this case.

In Wood, this court held that the defendant was not entitled to present expert testimony that he was easily coerced and susceptible to intimidation in order to support his claim that his confession to police was involuntary. Wood, 341 Ill. App. 3d at 608-09. This court noted that the defendant's claim was not beyond the understanding of ordinary citizens and that the trier of fact could have reached the same conclusion as the expert based on the defendant's testimony. Wood, 341 Ill. App. 3d at 608. Similarly, in Gilliam, the Illinois Supreme Court held that the trial court properly limited expert testimony that the defendant's desire to protect his family made him especially susceptible to police pressures and created a psychological compulsion to confess. Gilliam, 172 Ill. 2d at 512-13. The court held that whether the defendant falsely confessed to protect his family was not a concept beyond the understanding of ordinary citizens and was not difficult to understand or explain. The court also noted that the defendant was not precluded

from challenging the credibility of his confession and the jury could have reached the same conclusion as the expert based on the testimony of other witnesses. Gilliam, 172 Ill. 2d at 513.

Similarly, Dr. Frumkin's testimony that defendant was susceptible to police interrogations and suggestions based on his intellectual abilities was not beyond the understanding of ordinary citizens, nor a concept difficult to understand. In addition, the circuit court did not preclude defendant from challenging the credibility and weight of his confession. Rather, the court specifically stated that defendant could comment upon the evidence and the issue of suggestibility throughout defendant's trial.

Further, the jury received testimony in this case regarding defendant's school and intellectual performance. Defendant had a full opportunity to cross-examine the police officers and prosecutors that interrogated him about their techniques. The jury heard testimony regarding the conditions of defendant's interrogation, the length of time defendant was interrogated, the receipt and waiver of Miranda rights, and the content of the police questions and defendant's statements. The jury viewed defendant's videotaped confession and could assess the format in which the questions were presented and answers provided. It was reasonable for the trial court to conclude that the jury could decide the issue of the statement's reliability using its common knowledge and could have reached the same conclusion as Dr. Frumkin based on the testimony of the other witnesses and evidence. Consequently, the jury would not be aided by Dr. Frumkin's testimony. Accordingly, we cannot say that the trial court abused its discretion by excluding the testimony of Dr. Frumkin.

We also find defendant's reliance on United States v. Hall, 93 F.3d 1337 (7th Cir. 1996)

unconvincing. In <u>Hall</u>, the Seventh Circuit reversed because no hearing had been conducted, under the Federal Rules of Evidence, to determine whether the testimony of an expert on false confessions was admissible. The expert testimony regarding the defendant's alleged false confession was based on a diagnosed personality disorder. <u>Hall</u>, 93 F.3d at 1341. The court held that the expert testimony on this issue was relevant because "juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions." <u>Hall</u>, 93 F.3d at 1345. Here, defendant was not diagnosed with a personality disorder. Dr. Frumkin's testimony merely opined that defendant was susceptible to interrogations and suggestions based on his intellectual limitations. As previously discussed, we find no abuse of discretion where the circuit court could conclude that this testimony would not aid the jury. This conclusion makes it unnecessary to consider defendant's other claim of error relating to the exclusion of Dr. Frumkin's testimony.

## III.  CONCLUSION

For the above stated reasons, we affirm the judgment of the circuit court.

Affirmed.

NEVILLE and MURPHY, JJ., concur.