**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200085-U

Order filed July 26, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0085 Circuit No. 16-CF-569 |
| TRAVIS C. PHILLIPS, | ) ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HAUPTMAN delivered the judgment of the court.
Presiding Justice O'Brien and Justice Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: Defendant's convictions are affirmed where the circuit court properly denied defendant's motion to suppress and admitted evidence contested on the basis of an improper chain of custody.

¶ 2    Following a jury trial, defendant, Travis C. Phillips, was convicted of unlawful possession with intent to deliver a controlled substance and unlawful possession of a controlled substance. On appeal, defendant raises claims of error regarding the denial of his motion to

suppress and the court's decision at trial to admit certain contraband into evidence despite defendant's claim that the State failed to establish a proper chain for its admission. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On August 9, 2016, the State charged defendant by indictment with unlawful possession with intent to deliver a controlled substance (720 ILCS 570/401(a)(2(A) (West 2016)) and unlawful possession of a controlled substance (*id.* § 402(a)(2)(A)). The charges arose after officers discovered 15 or more grams of a controlled substance containing cocaine on defendant's person on or about July 31, 2016.

¶ 5        Prior to trial, defendant filed a motion to quash arrest and suppress evidence. In his motion, defendant alleged that he was detained and/or arrested absent probable cause and that the evidence obtained as a result of his unlawful arrest should be suppressed at trial. Defendant's motion proceeded to a suppression hearing on January 25, 2019.

¶ 6        Peoria police officer, Gerald Suelter, testified at the suppression hearing that he traveled to 731 East Willcox Avenue in the early morning hours of July 31, 2016, after receiving a ShotSpotter alert of approximately 10 shots fired at that address. Officer Suelter explained that ShotSpotter is a system that pinpoints the location of gunfire throughout the city. Within minutes of receiving the report, Officer Suelter arrived and observed another officer speaking to a female and several individuals in the yard and on the porch of the residence at 731 East Willcox Avenue. Officer Suelter observed shell casings in the street leading up to the address. Believing that someone at the scene may have a gun, officers at the scene ordered those present to the ground. Those gathered around the residence refused to comply and laughed at the officers. Officer Suelter drew his gun, describing the situation as an officer safety issue. Officer Suelter explained that after everyone was patted down for weapons, an investigation would have ensued.

¶ 7        However, Officer Suelter next observed defendant walk across the porch to the front door of the residence in an apparent attempt to get inside. Officer Suelter explained that he initially approached defendant to ascertain whether defendant had a gun on his person. Defendant had his hand on his waistband area, indicating to Officer Suelter that defendant may be in the possession of a weapon. Officer Suelter ordered defendant to stop several times, but defendant refused. Officer Suelter did not know if defendant had a gun or was attempting to get rid of a gun, but it was clear that defendant wanted to "get away from the officers that were on scene." At this point, Officer Suelter took hold of defendant as defendant struggled to reach the front door. Eventually, Officer Suelter placed defendant in handcuffs, reached into defendant's pocket, and discovered two large chunks of a white substance that appeared to have been cut from a kilo of cocaine. Officer Suelter seized the suspected contraband. Officer Suelter described the search as a search incident to arrest and provided that defendant was arrested because he disobeyed Officer Suelter's commands.

¶ 8        Peoria police officer, Travis Ellefritz, testified that he responded to the residence on Willcox Avenue after receiving the same ShotSpotter alert. Officer Ellefritz observed approximately five squad cars at the scene and testified that the street was full.

¶ 9        Peoria police officer, Ryan Isonhart, testified that he assisted another officer who had initiated a traffic stop of a car leaving the scene at the Willcox address. Officer Isonhart observed approximately 10 shell casings on the ground in front of the Willcox address.

¶ 10        Deandre White testified that he lived at the residence on Willcox Avenue. On the date in question, White hosted a party at his home. Around midnight or 1:00 a.m., several people followed White back into the residence, but others remained outside and throughout the block. Later, but still in the early morning, White went downstairs to put one of his children back to

sleep and was informed that the police were outside. White never heard gunshots. White exited the front door and was followed by approximately six people. White observed people standing around everywhere and so many police cars that he could not tell who was who. White posed a question to an officer and indicated that the officer yelled at him. At this time, the officer picked up a shell casing and ordered everyone to the ground. White clarified that the officer ordered those who had come out of the house onto the ground but was uncertain if everyone at the scene had received the same order.

¶ 11　　　　White observed officers order defendant to the ground, but defendant "just kind of stood on the porch like this the whole time, watching everything." Defendant continually asked whether he was under arrest, but no one answered. Defendant stated that since he was not under arrest, he could go into the house. Defendant turned to grab the door handle and was tased. White never observed defendant with his hand in his waistband.

¶ 12　　　　Defendant testified that he attended the party but did not hear gunshots because there was loud music inside the house. After hearing banging on the front door, defendant and approximately five other individuals followed White outside. Defendant observed five to seven police cars in the street and people everywhere. As defendant stood on the front porch, White began speaking with an officer. Thereafter, an officer shouted for everyone to get on the ground. Defendant described the timeframe from the knock on the door until the officer's order as unknown but approximated five to seven minutes had passed. One officer began walking toward defendant from the street. When asked if defendant complied when he was ordered to the ground, defendant responded:

　　　　"I mean, they took me down. I asked if I was under arrest. I asked if I'm being detained or under arrest. Nothing was said after that. I asked that three times. After that, I

4

said, since I have nothing [to] do with what's going on, I'm going in the house. I –turned and reached for the door, and that's when everything transpired from there."

¶ 13      Defendant testified that because the officer refused to answer his questions, defendant stated "Man, you know what, fuck this shit [,]" and then turned to reach for the door. Defendant stated that he was wearing basketball shorts and never grabbed his waistband.

¶ 14      In denying defendant's motion to suppress, the circuit court stated:

"We've heard from Officer Suelter who responded to 731 East Wil[l]cox due to ten shots being fired. Many people were in the street, and Mr. Deandre White, the resident of one of the residents [*sic*] of 731 East Wil[l]cox went outside, and [defendant] came out on to the porch.

Officer Suelter testified that there were casings out in the street leading up to the house, and Mr. White was talking to the police while [defendant] was on the porch. Mr. White did testify that [defendant] was behind him, but in any event, the police were trying to gain control of the area. The evidence from the officers suggested that it was a pretty chaotic scene.

A lot of people — some people were not complying with the commands of the police, and there was concern about someone having a gun and the safety of all of the people who were there surrounding 731 East Wi[l]lcox, and [defendant] turned to go inside. The Court has considered those facts coupled with the case law that was presented, and the Court finds that the police did have probable cause, and the motion is denied."

¶ 15      Defendant's jury trial began on September 16, 2019. Peoria police officer, Nathan Adams, testified that on July 31, 2016, at approximately 3 a.m., he responded to the residence on

Willcox Avenue after receiving a ShotSpotter alert of 10 rounds fired. Before he arrived, other officers had already located shell casings in front of the residence. Officer Adams was unsure whether someone had a gun in the yard or inside the residence. Officer Adams observed defendant on the front porch with a group of approximately six people. The individuals were not following commands and appeared intoxicated or just did not want to comply. Officer Adams described the situation as intense. Officer Adams observed Officer Suelter order defendant off the porch, but defendant stated that he was not going to comply. Defendant turned and opened the door to go back into the residence. Officer Suelter grabbed defendant and Officer Adams deployed his taser. The officers took defendant into custody and located currency and cocaine on his person.

¶ 16        Officer Suelter testified that he located the shell casings leading up to the residence after responding to a ShotSpotter alert. Officer Suelter ordered those on the scene to the ground, but several individuals were laughing and not taking the situation seriously. Officer Suelter observed defendant on the front porch heading for the front door after refusing to comply with Officer Suelter's commands. Defendant was holding his waistband, indicating that he either had a firearm in his waistband or something else that he did not want to drop out of his pants. Officer Suelter grabbed ahold of defendant's arm and attempted to place him in handcuffs, but defendant resisted. Officer Adams deployed his taser, and defendant was placed in handcuffs.

¶ 17        A subsequent search of defendant's front right pants pocket revealed two large pieces of a white substance in a plastic bag. Officer Suelter also recovered $689 from defendant's person. Officer Suelter tested the substance at the scene using a NIK wipe, which turned blue, indicating that the substance contained cocaine. The State presented People's exhibit No. 17, which Officer Suelter identified as the substance he recovered from defendant's person on July 31, 2016.

Officer Suelter knew People's exhibit No. 17 contained the same substance because the exhibit bore his initials, badge number, the incident number, and the date the substance was packaged.

¶ 18     On cross-examination, Officer Suelter testified that he and Officer Adams weighed the cocaine at the scene. After the scene was cleared, Officer Suelter drove to the police station and tagged the evidence. Officer Suelter identified Defense exhibit No. 6 as a copy of his police report, documenting that he submitted $689 and one large bag of cocaine into the property room. The report provided that the evidence was received by Officer 1026 (Officer Suelter's badge number) and that the suspected cocaine weighed 56.4 grams. Officer Suelter also identified Defense exhibit Nos. 1-5. Those exhibits consisted of the Peoria Police Department's general orders and internal policies concerning mobile video systems, managing criminal investigations, property and evidence control, temporary detention and interview room procedures, and responding to and handling ShotSpotter incidents. The exhibits were admitted without objection. Officer Suelter also testified that the incident occurred in 2016, before Peoria officers were equipped with body cameras. Officer Suelter was unsure whether a squad car video of the incident existed.

¶ 19     Peoria police officer, Corey Miller, testified that he viewed the evidence contained within People's exhibit No. 17 prior to testifying. When asked on cross-examination to define a proper chain of custody, Miller stated:

"In this case, obviously, it depends on what shift you work, but it could be taken by the officer. It could be — he could take the custody of it. He could take it down to the Peoria Police Department property room area. He could field test it there. He could have a sergeant come in and field test it there. He could package it according to policies and procedures. He could go ahead and put a tag on it and place it in the property room."

7

¶ 20    Peoria police officer, Lance Skaggs, testified that he transported evidence back and forth from the Peoria Police Department to the Morton Crime Lab. In this instance, incident number 16-16631, Officer Skaggs signed People's exhibit No. 17 out from the property room at the Peoria Police Department and physically transported the exhibit to the Morton Crime Lab. Defense exhibit No. 7, consisting of an evidence receipt, was admitted without objection. The evidence receipt documented that Officer Skaggs signed in an exhibit containing a plastic bag with a white substance containing a suspected controlled substance to the Morton Crime Lab on August 4, 2016, at 10:30 a.m. The evidence receipt listed defendant as the suspect, Officer Suelter as the investigating officer, and July 31, 2016, as the date of the offense. After returning from the Morton Crime Lab, the exhibit was kept in the property room at the Peoria Police Department. Officer Skaggs described the property room as a large, secured room that had a locked gate and doors.

¶ 21    Joni Little, a forensic scientist employed by the Morton Crime Lab, testified as an expert in the field of drug chemistry. Little identified People's exhibit No. 17 and explained that her evidence sticker was affixed to the exhibit, including the case number, exhibit number, the date received, and Little's initials. Little received the exhibit from Officer Skaggs on August 4, 2016, at the Morton Crime Lab. After receiving the exhibit, Little filled out the appropriate paperwork and placed it in the evidence vault. Little explained that she later weighed and analyzed the exhibit and concluded that it contained 56.2 grams of cocaine without the packaging. After testing, Little placed the cocaine back into the plastic bag, resealed the bag with blue evidence tape, and placed it back into the evidence vault. Little returned the exhibit to Officer Skaggs on December 14, 2016. Little testified that there had been no changes to the exhibit since that time, other than an additional exhibit sticker.

8

¶ 22     Following Little's testimony, the State sought the admission of People's exhibit No. 17. The defense objected on foundational grounds, arguing the State failed to preserve a proper chain of custody. People's exhibit No. 17 was admitted over defendant's objection after the court found that the requisite foundational requirements were satisfied.

¶ 23     The defense called Deandre White to testify. White testified that 30-40 people attended the party at his home on the date in question. Later that night, an officer located a shell casing in the street and ordered everyone to the ground. White went to the ground and was searched. Then, officers began calling the individuals down from the porch one by one to be searched. Defendant stated that he was not going to come down from the porch or get on the ground. Defendant proclaimed that he was not under arrest and that he was going back into the home. White testified that the entire situation occurred over a period of approximately 10 to 15 minutes.

¶ 24     The defense called Larry Ware, who worked as a property room technician at the Peoria Police Department. Ware explained that technicians work from 8 a.m. until 4 p.m. and that technicians are not present around the clock. Only two property room technicians had access to the property room, and officers do not go into the room by themselves.

¶ 25     At the conclusion of the trial, the jury found defendant guilty of unlawful possession with intent to deliver a controlled substance and unlawful possession of a controlled substance.[1] On October 16, 2019, defendant filed a motion for a new trial, arguing that the court erred when it denied his pretrial motion to suppress and admitted the cocaine into evidence at trial. The circuit court denied defendant's motion and sentenced defendant to a term of eight years' imprisonment. Defendant appeals.

---

[1]The counts were merged for sentencing purposes.

¶ 26                              II. ANALYSIS

¶ 27                              A. Chain of Custody

¶ 28         On appeal, defendant challenges the propriety of the admission of the cocaine at trial. Defendant argues the State failed to lay an adequate foundation upon which the cocaine could have been properly admitted. Defendant posits that the officers' alleged failure to comply with the Peoria Police Department's general orders and internal policies raises questions about whether a proper chain of custody was established. The State argues a proper chain of custody was established at trial and that the Peoria Police Department's general orders and internal policies do not represent an evidentiary standard that must be satisfied before evidence is properly admitted.

¶ 29         When seeking to introduce an object into evidence, the State may lay an adequate foundation either through the object's identification by a witness or through a chain of custody. *People v. Woods*, 214 Ill. 2d 455, 466 (2005). If an object is not readily identifiable, or may be susceptible to tampering, contamination, or exchange, the State bears the burden of establishing a chain of custody that is sufficiently complete, such that it is improbable that the evidence has been subject to tampering or accidental substitution. *Id*. at 467. The purpose of this protective measure is to ensure that the substance recovered from the defendant's person is the same substance tested by the forensic scientist. *People v. Fox*, 337 Ill. App. 3d 477, 481-82 (2003).

¶ 30         Once the State has demonstrated that reasonable protective measures were employed to ensure that the substance recovered from defendant was the same as that tested by the forensic scientist, the burden shifts to defendant to provide actual evidence of tampering, alteration, or substitution. *People v. Alsup*, 241 Ill. 2d 266, 274-75 (2011); *Woods*, 214 Ill. 2d at 467. When defendant fails to provide such evidence, a sufficient chain of custody does not require the

10

testimony of every witness connected to the chain to testify, nor does it require that the State exclude all possibility of tampering. *Alsup*, 241 Ill. 2d at 275; *People v. Harris*, 352 Ill. App. 3d 63, 69 (2004). It is also not erroneous to admit evidence when the chain of custody is missing a link if there was testimony establishing that the condition of the evidence when delivered matched the description of the evidence when examined. *Alsup*, 241 Ill. 2d at 275. At this point, deficiencies in the chain of custody go to the weight, not the admissibility of the evidence. *Id.*

¶ 31 The admission of evidence at trial is within the sound discretion of the circuit court and will not be reversed on appeal absent an abuse of discretion. *People v. Deroo*, 2020 IL App (3d) 170163, ¶ 41. A circuit court abuses its discretion only where its ruling was arbitrary, fanciful, or unreasonable, or where no reasonable person would have taken the view adopted by the court. *Id.*

¶ 32 The evidence presented at trial more than established that reasonable, protective measures were employed to ensure that the substance recovered from defendant was the same as that tested by the forensic scientist. Officers Suelter and Adams testified that on July 31, 2016, at approximately 3 a.m., they took defendant into custody and located currency and a plastic bag containing a white substance on his person. Officer Suelter field tested the white substance with a NIK wipe, which revealed the presence of cocaine. Officer Suelter weighed the substance at the scene, placed an evidence tag on the substance, and transported the substance to the property room at the Peoria Police Department. At trial, Officer Suelter identified People's exhibit No. 17 as the substance he recovered from defendant's person. Officer Suelter knew People's exhibit No. 17 contained the same substance because the exhibit bore his initials, badge number, incident number, and the date he packaged it. Officer Suelter's report from the night in question also reflected that the suspected cocaine weighed 56.4 ounces.

¶ 33        Officer Skaggs testified that he physically transported People's exhibit No. 17 back and forth from the Morton Crime Lab. The evidence receipt depicted in Defense exhibit No. 7 documented that Officer Skaggs signed in an exhibit consisting of a plastic bag containing a suspected controlled substance to the Morton Crime Lab on August 4, 2016. The evidence receipt listed defendant as the suspect, Officer Suelter as the investigating officer, and July 31, 2016, as the date of the offense.

¶ 34        Forensic scientist, Joni Little, confirmed that she received People's exhibit No. 17 on August 4, 2016. Upon receiving the exhibit, Little completed the appropriate paperwork and placed it in the evidence vault. Little later weighed and analyzed the exhibit and concluded that it contained 56.2 ounces of cocaine without its packaging, which was nearly identical to the weight measurement Officer Suelter took at the scene. After testing, Little placed the cocaine back into the plastic bag, resealed the bag with blue evidence tape, and placed it back in the vault. Little returned the exhibit to Skaggs on December 14, 2016. Officer Skaggs testified that after returning from the Morton Crime Lab, the exhibit was kept in the property room at the Peoria Police Department. Little confirmed at trial that there had been no changes to the exhibit other than the People's exhibit sticker.

¶ 35        Despite this seemingly complete chain of custody, defendant asserts that Officer Suelter's failure to sufficiently comply with the general orders and internal policies of the Peoria Police Department resulted in evidence that was unreliable. In support of this argument, defendant's brief cites to several exhibits admitted at trial, consisting of the Peoria Police Department's general orders and internal policies regarding mobile video systems, managing criminal investigations, property and evidence control, temporary detention and interview room procedures, and responding to and handling ShotSpotter incidents. Defendant asserts that Officer

Suelter failed to comply with the prescribed procedures in that he failed to record himself removing the drugs from defendant's person at the scene, improperly weighed the drugs at the scene, drove the evidence to the station by himself, entered the property room without clearance, and failed to record the time. Defendant's argument is unpersuasive for several reasons.

¶ 36    First, defendant does not allege or provide any evidence that People's exhibit No. 17 was subject to actual tampering, alteration, or substitution. Second, defendant cites to no authority, and we find none, providing that an officer's compliance, or lack thereof, with internal departmental policies has any bearing on the admissibility of evidence at trial. In fact, the general orders and internal policies cited by defendant expressly provide that they are "for internal use only" and "should not be construed as the creation of a higher standard of safety or care in an evidentiary sense." Third, four out of the five general orders and internal policies to which defendant cites became effective long after the events that transpired in this case, rendering those policies wholly inapplicable.

¶ 37    Overall, the testimony at trial established that the substance recovered from defendant's person was the same substance tested by Little at the Morton Crime Lab and eventually admitted at trial. As such, the court's admission of People's exhibit No. 17 at trial was not an abuse of discretion.

¶ 38                                   B. Motion to Suppress

¶ 39    Defendant next argues the circuit court committed error when it denied his motion to suppress. Defendant alleges the officers at the scene lacked the reasonable articulable suspicion of criminal activity necessary to briefly detain him. In opposition, the State goes one step further, arguing the totality of the circumstances were such that officers had probable cause to arrest

13

defendant. For this reason, the State urges this court to affirm the denial of defendant's motion to suppress.

¶ 40     When reviewing the propriety of the denial of a motion to suppress, reviewing courts give deference to the factual findings of the circuit court and will reverse such findings only if they are against the manifest weight of the evidence. *People v. Smith*, 2016 IL 119659, ¶ 43. However, the ultimate legal ruling regarding whether suppression is warranted is reviewed *de novo*. *Id*. In making this legal determination, reviewing courts may utilize both the evidence presented at the suppression hearing and at trial. *People v. Hopkins*, 235 Ill. 2d 453, 473 (2009).

¶ 41     Our supreme court provides that police citizen encounters can be divided into three tiers, which include: (1) arrests, supported by probable cause; (2) brief investigative detentions, or *Terry* stops, which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). On appeal, the State posits that because defendant was handcuffed and subsequently searched, the question before this court does not concern the propriety of a *Terry* stop, but rather whether officers had probable cause to arrest defendant. In other words, the State concedes that the propriety of the officers' actions should be reviewed under a higher standard than that necessary to justify a lawful *Terry* stop. Reviewing courts, however, are not bound by such concessions. *People v. Carter*, 2015 IL 117709, ¶ 22. Accordingly, we will conduct an independent analysis to determine the nature of this detention.

¶ 42     The evidence adduced at the suppression hearing and at trial revealed that on July 31, 2016, at approximately 3 a.m., multiple officers responded to 731 East Willcox Avenue after receiving ShotSpotter alerts of 10 rounds fired in front of that address. Upon arrival, Officer

14

Suelter observed several individuals in the yard and on the porch of the residence. Officer Suelter's assessment of the scene was corroborated by homeowner, Deandre White, who testified that he came out onto the porch followed by approximately six people and viewed people everywhere and "so many cop cars that you really couldn't tell who was who really." At some undefined point in time, Officer Suelter observed shell casings in the street leading up to the address. Those on the scene were ordered to the ground as officers intended on conducting pat downs for weapons. Some individuals refused to comply and laughed at the officers. Due to officer safety issues, premised on the belief that someone at the scene may have a gun, Officer Suelter drew his weapon. Thereafter, White testified that he went to the ground and was searched. Then, officers began calling the individuals down from the porch one by one to be searched. Defendant stated that he was not going to come down from the porch or get on the ground. Defendant asked repeatedly whether he was under arrest and stated that since he was not under arrest, he intended to go into the house.

¶ 43    Defendant walked to the front door and attempted to go inside. At this time, Officer Suelter observed defendant with his hand on his waistband area and approached defendant to ascertain whether defendant had a gun. Officer Suelter believed that defendant may have had, or was attempting to get rid of, a gun. Officer Suelter grabbed ahold of defendant's arm and attempted to place him in handcuffs, but defendant resisted. White testified that when defendant turned to grab the door handle, he was tased. Officer Adams confirmed that he deployed his taser. After a struggle, defendant was placed in handcuffs and searched.

¶ 44    After receiving this evidence at the suppression hearing, the circuit court found that the officers were attempting to gain control of a chaotic scene, where some people were not complying with their commands. The court found that defendant turned to go inside, despite the

15

concern that someone may have a gun, threatening the safety of those surrounding the residence. We accept the court's factual findings as we cannot say they were against the manifest weight of the evidence.

¶ 45    Based on these facts, the officers' original intent to pat down those present at the scene for weapons fits neatly within the framework of *Terry*. *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* instructs that a police officer may stop and detain a person without probable cause to investigate possible criminal activity if the officer can point to specific, articulable facts, which, taken together with rational inferences, reasonably warrant the intrusion. *Id*. at 21; see *People v. Bennett*, 376 Ill. App. 3d 554, 565 (2007) (instructing that investigatory detentions are distinguished from arrests based on the length of the detention and the scope of the investigation following the detention, not the initial restrain of movement); see *People v. Colyar*, 2013 IL 111835, ¶ 45 (when an officer has a reasonable suspicion that an individual may be armed and dangerous, the officer may take necessary measures to determine whether the person is armed and to neutralize any threat of physical harm).

¶ 46    In *Colyar*, our supreme court discussed *Terry* at length, referencing the balancing act between a police officer's need to protect himself and others from danger, with a citizen's right to be free from unreasonable searches and seizures. *Id*. ¶¶ 33-37. The *Colyar* court explained that the crux of *Terry* was an officer's immediate interest in taking steps to ensure that the individual he or she is dealing with is not armed with a weapon that could be used fatally against the officer. *Id*. ¶ 34. Indeed, the *Terry* court concluded that:

>    "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual

16

whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

The *Terry* court further admonished that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. at 27.

¶ 47 Reviewing the actions of these officers under an objective standard, a reasonably cautious individual in a similar situation could reasonably suspect the presence of a gun at this scene, which implicates officer safety and the safety of others. See *Colyar*, 2013 IL 111835, ¶ 43 (the discovery of a bullet in defendant's center console gave rise to the reasonable suspicion that a gun may be near). Thus, under the totality of the circumstances, the moment the officers observed shell casings in the street leading up to White's residence, they were justified in briefly detaining those at the scene for purposes of conducting a *Terry* pat down, as it was equally likely that anyone at the scene was armed. Because the officers were legally entitled to briefly detain defendant for purposes of a pat down, we affirm the circuit court's denial of defendant's motion to suppress. Defendant's convictions are affirmed.

¶ 48                                  III. CONCLUSION

¶ 49 The judgment of the circuit court of Peoria County is affirmed.

¶ 50 Affirmed.

17