# Illinois Official Reports

## Appellate Court

---

### *People v. Booker*, 2015 IL App (1st) 131872

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES BOOKER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-1872 |
| Filed | May 12, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-9567; the Hon. James M. Obbish, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded with directions. |
| Counsel on Appeal | Laura A. Weiler, of DePaul University Legal Clinic, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LUI delivered the judgment of the court, with opinion.<br>Presiding Justice Simon and Justice Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant, James Booker, was convicted of home invasion while armed with a dangerous weapon, robbery, attempted robbery, and unlawful restraint. At sentencing, the court merged defendant's unlawful restraint convictions into the home invasion counts and sentenced defendant to concurrent prison terms totaling 15 years. On appeal, defendant contends that: (1) the State failed to establish beyond a reasonable doubt that he committed the offenses because only two of the four witnesses identified him as the perpetrator; (2) the trial court erred in denying his motion to quash and suppress because the police lacked reasonable suspicion when they detained him; (3) he was denied due process when he was convicted of an uncharged offense which was not a lesser-included offense of any of the crimes with which he was charged; (4) the 15-year sentence imposed for his four home invasion convictions is excessive; (5) three of his home invasion convictions must be vacated under the one-act, one-crime doctrine; and (6) the mittimus must be corrected to reflect the proper sentence of three years for his attempted robbery conviction. We affirm in part and reverse in part.

¶ 2      <center>I. BACKGROUND</center>

¶ 3      On June 4, 2011, Tomasz Komperda, Robert Rusnak and Tomasz Plewa were performing construction work in Tina Calvin's house at 6049 South Maplewood Avenue in Chicago. While Komperda was outside of the house looking for tools in his van, he was suddenly approached by a man who pointed a gun at him and demanded money. After taking a $1 bill and a GPS navigation system from the van, the offender forced Komperda into the house while holding the gun at his back. Once inside, the offender demanded money from the other workers and Calvin, all of whom were in or near the kitchen. Calvin eventually ran to another room and called 9-1-1. The offender subsequently fled from the house, heading southbound in the alley.

¶ 4      Police officers responded to a radio dispatch regarding a robbery at Calvin's house and immediately drove there. Within 10 to 15 minutes of getting a description of the offender from one of the witnesses, the officers observed defendant at an intersection approximately three blocks south of the house. Defendant's appearance fit the witness's description of the offender–a black male with neck tattoos and a white t-shirt. The officers handcuffed defendant and drove him to the house, where two of the four witnesses identified him in a show-up procedure. Defendant was arrested and charged with home invasion while armed with a firearm, aggravated unlawful restraint, attempted armed robbery, armed robbery and aggravated kidnapping.

¶ 5      <center>A. Motion to Quash and Suppress</center>

¶ 6      Prior to trial, defendant filed a motion to quash his arrest and suppress the show-up identification (motion to suppress). He argued that the identification evidence should be excluded because the police lacked probable cause when they "arrested" him.[1] The State

---

[1]During the hearing, defendant also argued that the show-up identification was "impermissibly suggestive"; on appeal, however, he does not challenge the propriety of the show-up.

argued that defendant was properly detained because he matched the description of the offender given by a witness and that he was detained, not arrested, prior to the show-up where two of the victims positively identified him.

¶ 7        During the hearing on his motion to suppress, defendant testified that on June 4, 2011, at approximately 1 p.m., he was stopped by police officers at the intersection of 64th Street and South Maplewood Avenue, near the house at 2517 West 64th Street where he resided with his mother. The officers handcuffed him, put him in an unmarked police vehicle, and drove him "down the block" to 6049 South Maplewood. When they arrived at the South Maplewood house, the officers displayed him, while handcuffed, to two white men and a white woman. According to defendant, the officer "grabbed" his right arm and said to the three witnesses, "this is the person that robbed yawl." The men and woman talked to each other for "about a minute," after which all three said, "I don't think that's him." At the time of his "arrest," defendant had tattoos on both sides of his neck and arms and one on his face.

¶ 8        Officer Patrick Felker, a Chicago policeman, testified that he conducted the show-up at around 1:30 p.m. on June 4 at the house at 6049 South Maplewood Avenue. Felker stated that when he and his partner arrived at the house the first time in response to a dispatch regarding a robbery, Rusnak met them outside and described the offender as "a male black with tattoos on his face and neck and a white t-shirt." The officers were also told that the offender had fled "southbound in the alley." Felker began to "tour[ ] the area" and within "five to ten minutes," saw defendant "[a]bout three blocks south of there at 64th and Maplewood" with "at least one other guy." The other man was also a black male. Defendant was wearing a white T-shirt and had tattoos on his face and neck. When Felker saw him, he "jumped out of the car and detained [defendant] and put handcuffs on him." The officers then drove defendant to the house for the show-up identification. Felker explained that, prior to conducting the show-up, he instructed each of the four witnesses–Calvin, Rusnak, Plewa and Komperda–to "stay apart" and after each witness "looked at [defendant] he was kept to the side." During the show-up, each witness viewed defendant separately and "was not allowed to go back [to the others] and talk about the show-up." Rusnak and Calvin identified defendant as the offender, but Plewa and Komperda were unable to identify him positively as the offender. Felker stated that Calvin is a black woman.

¶ 9        Felker admitted that he had not been given a description regarding the offender's age, height, weight, hairstyle, or eye color before he encountered defendant. Additionally, Felker acknowledged that in his case report, he noted that the witness had reported neck tattoos on the suspect but there was no reference to any facial tattoos. Felker stated that defendant was detained, but not arrested, prior to the show-up.

¶ 10       The trial court denied the motion to suppress after finding the detention "reasonable under the circumstances." The court noted that the officers observed defendant "within 10 to 15 minutes of the offense," three blocks from the scene of the crime, and that his appearance matched the description of the offender, who "had fled southbound into the alley"–a "male black wearing a white t-shirt with tattoos on his neck." The court concluded that the detention, handcuffing and transportation of defendant to the crime scene was "appropriate" under the circumstances because "[t]he law does allow a brief detention of individuals if appropriate to try to make a quick determination as to whether or not that individual is in fact an offender or not."

¶ 11    While defendant does not challenge the propriety of the show-up identification, it is worth noting that the court found that the police officers "took some significant steps to try to avoid the procedure becoming anymore suggestive than a show-up apparently is." In addressing defendant's argument that alternative identification methods could have been used, the court observed that: (1) there was "no information whatsoever that the police had Mr. Booker's photo" and (2) a lineup identification "would have not only taken hours to perform," but would have involved possibly keeping an innocent person in custody at the police station.

¶ 12                                B. The Bench Trial

¶ 13    At trial, there was no dispute among the State's witnesses that the offender was a black male with neck tattoos wearing a white T-shirt, that he entered the house between noon and 1 p.m., and that he held a gun at Komperda while yelling at everyone to give him money. Furthermore, none of the witnesses recalled that the offender had any speech impediment.

¶ 14                            1. Robert Rusnak's Testimony

¶ 15    Rusnak identified defendant in open court as the man who entered the house on June 11 while Rusnak was working in the kitchen. He testified that defendant was pointing a small, dark, brown revolver at Komperda's back and yelling at everyone to give him money. Rusnak noticed that defendant was also holding a $1 bill and had a GPS navigation device in his pocket. Calvin, the owner of the house, was "peeking out" from a nearby room "on the threshold" of the kitchen. When defendant demanded money from her, she said she had no money and "hid back into the room." Defendant then threatened to shoot everyone if they did not give him money. At one point, defendant attempted "to pat [Rusnak] down" in order "to see if [Rusnak] had anything in [his] pockets." Komperda then freed himself from defendant and ran to the front of the house, while "Plewa found shelter in one corner of the kitchen" and Rusnak ran to another corner. Rusnak then "heard [a] loud noise," which he believed was defendant "fleeing the scene," and immediately closed the door of the house.

¶ 16    Shortly afterwards, when the police officers arrived at the house, Rusnak told them that the offender was a black man with hair just above his shoulders who was "slightly taller" than Rusnak and "wearing a white t-shirt just like almost everybody else." Rusnak acknowledged that he did not mention any tattoos on the offender in his initial description to the police because Rusnak thought that "it's a common thing for every black guy to have a tattoo so [he] didn't pay any attention to any tattoos." During the show-up, Rusnak recognized defendant as "the person that came over with the gun in his hand, the person that held us up."

¶ 17    On cross-examination, Rusnak testified that he did not recall if the offender had a tattoo on his face. He further admitted that his view of the offender was limited to the extent that Komperda was standing between him and the offender, but stated that his view of defendant was "[n]ot completely" obstructed. When the offender tried to pat him down for money, he was standing "slightly to the side" and "[w]ithin arm's reach" of Rusnak.

¶ 18                            2. Tina Calvin's Testimony

¶ 19    Calvin identified defendant during the trial as the offender who was in her house on June 4, 2011. She testified that she was in a room next to the kitchen when she heard a voice "saying money, money, money" and saw a "young black man" holding a gun at the back of

Komperda's head. She described the gun as a "very, very small" black revolver and recalled that defendant's hand had "encompassed most of the gun." After she told the offender that she had no money, she ran into her room and called 9-1-1. She described the offender to the 9-1-1 operator as a "young black man with a white t-shirt and neck tattoos."

¶ 20    According to Calvin, the police later brought defendant to her house and told her that "they had someone and they wanted [her] to look at him." Despite having seen the offender for "less than two minutes" during the incident, she recognized the suspect that the police brought with them as the offender because she "had gotten a good look at his face" and recognized his neck tattoos and a mark on his right cheek. Calvin stated that she had noticed a mark on the offender's cheek at the time of the incident, but did not know then that it was a tattoo.

¶ 21    Calvin admitted, during cross-examination, that she did not tell the 9-1-1 operator about the mark on defendant's face when she was reporting the incident and that she did not mention any facial tattoos or marks when she spoke with two detectives about the robbery later that day.

### 3. Tomasz Komperda's Testimony

¶ 23    Komperda testified that he was in the back of his van outside of Calvin's house when a man approached him "with a gun in his hand" and demanded money. According to Komperda, the man was a slender black male, approximately 175 centimeters tall, with a tattoo on his neck, and he was holding "a small revolver" that was "dark, kind of brown" and "five to six" inches long. The offender pointed the gun at Komperda's head and told him to find some money. He later took a dollar bill and a GPS navigation system from the van. He then directed Komperda into the house while holding a gun at his back. When they entered the kitchen, the offender also pointed the gun at the other workers, Rusnak and Plewa, and demanded money. Eventually, the offender "yelled said [*sic*] something and said something a couple more times" before pushing Komperda away. Komperda "ran towards the front of the house and stayed there." When he returned to the kitchen a moment later, the offender had fled.

¶ 24    Komperda testified that when the police first arrived at the house with a suspect in the back of the police car, Komperda "was in great shock" and, at the time, did not recognize the suspect's face. However, when he heard the suspect's voice, he recognized the voice as that of the offender who had been in the house. He described the offender's voice as "specific" and a "squeaky kind of voice, childish voice."

¶ 25    On cross-examination, Komperda explained that he saw the offender's face during only the "first couple moments" because the offender was behind him "throughout all the rest of the time." However, Komperda testified that he "clearly exactly heard his voice" as the offender was standing next to him. He recalled that the offender had a "significant" tattoo on his neck but could not describe it. He did not recall whether there was a tattoo on the offender's arms or face and did not remember the color of the short-sleeved T-shirt worn by the offender. Finally, Komperda did not recall whether the offender had a speech impediment.

### 4. Tomasz Plewa's Testimony

¶ 27    Plewa testified that he was working in the kitchen when a "black-skinned man walked [Komperda] into the kitchen at gunpoint." Plewa recalled that the gunman had a tattoo on the right side of his neck and held a small revolver that was "[s]even to nine inches" long. The offender "kept on screaming give him the money." When the offender grabbed Plewa by the

shirt, Plewa backed up to free himself and "ran into one corner of the kitchen" while Rusnak fled to "another corner of the kitchen." When the police arrived later at the house with a suspect, Plewa was unable to identify him as the offender.

¶ 28 Plewa admitted that he did not recall what the offender was wearing or whether there were tattoos on his arms; he only noticed the tattoo on the right side of the offender's neck and did not recall any facial tattoos or neck tattoos. Plewa explained that during the show-up, he told the police that the suspect "was not the gunman" because he was not "sure if it was that person a hundred percent even though that person also had a tattoo" in the same place. He remembered that the offender screamed clearly when he was demanding money.

¶ 29                                5. Officer Felker's Trial Testimony

¶ 30 Officer Felker's testimony at trial was substantially similar to the testimony he gave at the suppression hearing. On June 4, 2011, he was working with a partner when they heard a call reporting a person with a gun and someone being held hostage at gunpoint. They drove right away to the location of the crime, 6049 South Maplewood Avenue. After Rusnak gave a description of the offender, Felker and his partner toured the area and observed a black male, with neck tattoos and a white T-shirt, at an intersection on 64th Street and Maplewood, three blocks from the scene of the robbery. The officers approached defendant, handcuffed him, and brought him to 6049 South Maplewood for a show-up identification procedure. Both Calvin and Rusnak identified defendant as the intruder. Defendant was then placed in secure custody and transported to the station for processing. Felker prepared an arrest report and a case report.

¶ 31 During cross-examination, Felker testified that he did not recall if defendant was sweating when the officers encountered him, but agreed that he did not appear to be out of breath. Felker admitted that they did not find a firearm, GPS device, or any proceeds from the robbery. He also stated that during his interview of defendant at the police station, he observed defendant "slightly stuttering" but did not know "if that was because of an impediment or he was nervous or what not."

¶ 32                                C. Ruling and Sentencing

¶ 33 The trial court ruled that the State proved, beyond a reasonable doubt, that defendant was the offender who had entered the house on June 4, 2011. The court pointed to the evidence of "two positive eyewitness identifications within minutes of the offense and *** a voice identification from another witness." The court determined, however, that the conflicting accounts regarding the description of the gun–particularly as to its size–presented "quite a dispute as to the weapon." Further, the court pointed out that "[n]o gun was ever fired *** [and] no gun is ever recovered when the defendant is placed under arrest three blocks away."

¶ 34 Ultimately, the trial court found defendant guilty of home invasion while armed with a dangerous weapon, robbery, attempted robbery, and unlawful restraint. At sentencing, the State offered statements in aggravation and recommended concurrent 15-year prison terms. Defendant's counsel reported that defendant had no prior criminal history other than probation as a juvenile for residential burglary and suggested the minimum sentence of six years. After giving a detailed explanation of its consideration, the trial court imposed concurrent sentences of 15 years for each conviction of home invasion while armed with a dangerous weapon other than a firearm (720 ILCS 5/12-11(a)(1) (West 2010)), 5 years for the robbery conviction (720 ILCS 5/18-1(a) (West 2010)), and 3 years for each attempted robbery conviction (720 ILCS

5/8-4, 18-1(a) (West 2010)). Defendant's unlawful restraint convictions were merged into the home invasion counts. Defendant was given 694 days' credit for time served.

¶ 35                                                            II. ANALYSIS

¶ 36        On appeal, defendant argues that: (1) the State failed to prove him guilty of the offenses beyond a reasonable doubt; (2) the police lacked a reasonable suspicion to detain him based on the description given by the witness; (3) the trial court improperly convicted him of the uncharged offense of home invasion with a dangerous weapon when it was not a lesser-included offense of any of the charged offenses; (4) the 15-year sentences for his home invasion convictions are excessive and the court failed to consider mitigating circumstances; (5) three of his four sentences for home invasion must be vacated under the one-act, one-crime doctrine; and (6) the mittimus should be corrected to reflect a three-year sentence for attempted robbery.

¶ 37        Before we can address the issue of whether there was sufficient evidence to sustain defendant's convictions, we must first resolve two of the other issues raised by defendant: (1) whether the police officers had a reasonable, articulable suspicion when they stopped and detained defendant; and (2) whether defendant's convictions for the uncharged offense of home invasion with a dangerous weapon other than a firearm violate due process.

¶ 38                                            A. Reasonable, Articulable Suspicion

¶ 39        Defendant contends that the trial court erred in denying his motion to suppress because the police lacked a reasonable, articulable suspicion to detain him for the show-up identification.[2] The review of a trial court's ruling on a motion to suppress presents mixed questions of law and fact. *People v. Wear*, 229 Ill. 2d 545, 561 (2008); *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). The trial court's factual findings will be upheld unless they are against the manifest weight of the evidence. *Gherna*, 203 Ill. 2d at 175. This deferential standard "is premised upon the reality that the circuit court is in 'a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony.' " *Id*. (quoting *People v. Gonzalez*, 184 Ill. 2d 402, 412 (1998)). "Where no dispute exists as to the underlying facts, our task is to determine the legal effect of those facts, *i.e.*, whether the trial court's ultimate ruling that suppression was warranted was correct." *People v. Close*, 238 Ill. 2d 497, 504 (2010). Therefore, whether the evidence should have been suppressed is subject to a *de novo* determination. *Id.*; *People v. Ross*, 317 Ill. App. 3d 26, 29 (2000).

¶ 40        An investigative detention is reasonable under the fourth amendment if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S 1, 21 (1968). Under *Terry*, an officer may conduct an investigatory stop without violating search and seizure laws if he has a reasonable suspicion, based on specific and articulable facts, that the person has committed or is about to commit a crime. 392 U.S. at 21-22. See also 725 ILCS 5/107-14 (West 2012) (codifying the *Terry* standard in the Illinois Code of Criminal Procedure of 1963).

_____
[2]We note that, on appeal, defendant has abandoned his argument that the show-up identification was the product of an illegal arrest or that the police lacked probable cause to arrest him and, therefore, has waived the issue. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

¶ 41    The validity of a *Terry* stop for investigative reasons turns on the totality of the circumstances known to a police officer at the time of the stop. *People v. Jackson*, 2012 IL App (1st) 103300, ¶ 18. As our supreme court has observed, "[t]he facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch" and "should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001) (citing *People v. Long*, 99 Ill. 2d 219, 228-29 (1983)). In other words, we must ask whether " 'the facts available to the officer at the moment of the seizure *** "warrant a man of reasonable caution in the belief" that the action taken was appropriate.' " *Close*, 238 Ill. 2d at 505 (quoting *Terry*, 392 U.S. at 21-22); see also *Ross*, 317 Ill. App. 3d at 29 ("The reasonableness of an investigatory stop may be determined by examining whether the police were aware of specific facts giving rise to reasonable suspicion and whether the police intrusion was reasonably related to the known facts.").

¶ 42    Here, Officer Felker testified that, within minutes of the robbery, a witness told him that the suspect was a black male with neck tattoos wearing a white T-shirt. Based on information that the offender fled "southbound in the alley," he searched the area south of the crime scene. Within 10 to 15 minutes, he found defendant at an intersection three blocks south of the crime scene and he thought defendant "absolutely" fit the witness's description of the suspect. Considering the totality of the circumstances known to Officer Felker at the time he encountered defendant, including that he found defendant in close proximity to the crime scene within a short window of time after the incident and the distinguishing characteristics of a neck tattoo and a white T-shirt, we conclude that Officer Felker had sufficient facts to support a reasonable suspicion under *Terry* and section 107-14.

¶ 43    We find the facts in this case to be very similar to those in *People v. Bennett*, 376 Ill. App. 3d 554, 565 (2007). In *Bennett*, the police officer stopped the defendant after searching the nearby area for a shooting suspect whom a witness described as "a black male wearing a black 'hoodie.' " *Id*. at 556. The officer saw the defendant, a black man wearing a black hoodie, running down the street where the perpetrator had reportedly fled. *Id*. at 564. After summoning the defendant over to the squad car, the officer placed his hand on the defendant's chest and felt "a rapid heart beat." *Id*. at 556. The defendant was handcuffed and driven two blocks away, to the scene of the shooting, where the witness identified him as the gunman in a show-up. *Id*. at 556-57. This court affirmed the defendant's conviction after finding that the officer had "the minimal articulable suspicion required to stop defendant" when he encountered him, based on the description of the suspect. *Id.* at 564.

¶ 44    Here, as in *Bennett*, the trial court correctly determined that the information known to Officer Felker at the time he detained defendant, *i.e.*, the suspect's gender, skin color, neck tattoo, white T-shirt, and direction of flight, was sufficient to support the officer's "minimal articulable suspicion" that defendant was the offender.

¶ 45    We also find support for our conclusion in *Ross*, 317 Ill. App. 3d at 30, where we upheld the detention of a defendant about half a block away from the crime scene, because the "facts provided at least the minimal articulable suspicion required to stop [him]." The victim in that case had reported being robbed and choked by "a black man wearing a blue shirt and pants." *Id*. at 28. The officer testified that at the time he saw and stopped the defendant, a black man wearing a blue shirt who was approximately "one block plus about 100 feet" from the victim's home, there were no other pedestrians in the area. *Id*. On appeal, we reversed the trial court's

- 8 -

order granting defendant's motion to quash and suppress. We found that there was reasonable suspicion to support the officer's detention of defendant because the defendant matched the description given by the victim, and was seen walking a little more than a block from the victim's home "within minutes of the crime." *Id*. at 30.

¶ 46 Defendant argues that the description given in this case was insufficient to justify a reasonable, articulable suspicion because there was "no information regarding the suspect's age, height, weight, complexion, facial hair, or other distinguishable characteristics." However, this court has noted that a general description of a suspect together with "other specific circumstances that would lead a reasonably prudent person to believe the action taken was appropriate can constitute sufficient cause to stop or arrest." *Ross*, 317 Ill. App. 3d at 29-30. See also *People v. Cox*, 295 Ill. App. 3d 666, 668 (1998) (upholding *Terry* stop where the description of the suspect was limited to gender, skin color, shirt color, and height). When viewing the totality of the facts existing at the time Officer Felker stopped defendant, we cannot conclude that a lack of description as to the offender's hair color, height, weight, or distinguishing marks *in addition* to the neck tattoo negated the existence or strength of the facts sufficient to support the officer's reasonable suspicion.

¶ 47 Defendant also asserts that Officer Felker's testimony at the suppression hearing regarding the description he received from Rusnak prior to the stop was contradicted by Rusnak's testimony at trial. Specifically, defendant alludes to Rusnak's trial testimony that he did not mention the neck tattoos to the police because, in his experience, "it was very common for black men to have tattoos." Defendant further suggests that Officer Felker's reliance on information about the southbound direction of flight was faulty because the evidence at trial shows that "none of the witnesses actually saw the offender leave the house."

¶ 48 We find no merit in this argument. First, defendant conflates the issue of what the officer knew at the time of the stop and the testimony of trial witnesses months after the stop. Contrary to defendant's assertion, the relevant inquiry as to whether Officer Felker had reasonable suspicion to detain defendant turns on the evidence regarding the facts or information known to him at the *time of the stop*. See *Close*, 238 Ill. 2d at 505 (requiring the "specific and articulable facts" that support the officer's reasonable suspicion to exist at the "inception" of the stop (internal quotation marks omitted)). Second, we defer to the trial court's findings of fact because the trial court "is in 'a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony.' " *Gherna*, 203 Ill. 2d at 175 (quoting *Gonzalez*, 184 Ill. 2d at 412). In order to justify a departure from the court's factual findings, we must find that they are against the manifest weight of the evidence. *Gherna*, 203 Ill. 2d at 175. Here, the trial court heard Officer Felker's testimony at the hearing on the motion to suppress and also heard testimony from both Rusnak and Officer Felker at the bench trial. In addition to denying defendant's motion to suppress after the motion hearing, the trial court also denied defendant's motion for judgment notwithstanding the verdict after the bench trial in which defendant argued that the trial court erred in denying his motion to suppress. From this we can infer that the trial court accepted Felker's testimony at the hearing, even in light of the potentially conflicting witness testimony presented at trial, and, furthermore, we do not find the court's findings to be against the manifest weight of the evidence.

¶ 49 Finally, defendant cites *People v. Washington*, 269 Ill. App. 3d 862 (1995), as support for his argument that no reasonable suspicion existed to warrant the stop in this case. In

*Washington*, two police officers testified that after receiving a radio dispatch concerning a robbery at a nearby restaurant, they saw defendant and approached him "because he fit the description *** [from] the radio dispatch." *Id*. at 864-65. However, the State failed to present any evidence at trial regarding (1) the "perpetrator's appearance" as described by the dispatch or (2) the "appearance or clothing of the defendant at the time of the stop." *Id*. at 866-67. The court granted the motion to suppress because it held that absent such evidence, the State could not establish sufficient facts to demonstrate that the officers had reasonable suspicion to stop the defendant. *Id*. at 866. A majority of the divided panel affirmed the trial court's ruling, explaining that "the trial court had no opportunity to determine whether the description of the offender and the physical characteristics of the defendant were similar enough to justify the detention of the defendant."[3] *Id*. at 867.

¶ 50        Here, we are presented with a completely different situation than that encountered by the court in *Washington*. Whereas in *Washington* there was no description of the offender presented at trial, the State here presented testimony that Officer Felker received a description of the offender as a black man with neck tattoos wearing a white T-shirt who had fled south from the crime scene. The police detained defendant because he matched that precise description and because he was found approximately three blocks south of the crime scene within 15 minutes of the crime. Defendant's reliance on *Washington* is ultimately misplaced.

¶ 51                                     B. Conviction of Uncharged Offense

¶ 52        Defendant also asserts that his convictions for home invasion must be vacated because home invasion while armed with a dangerous weapon other than a firearm is not a lesser-included offense of home invasion while armed with a firearm, and he was charged only with the latter. Initially, the State contends that defendant forfeited this issue on appeal because he failed to object to his convictions for home invasion with a dangerous weapon and failed to raise the issue in his posttrial motion. The State further claims that defendant forfeited review of this issue under the plain error doctrine because he failed to request a plain error review in his opening brief. Defendant's reply brief, however, does raise plain error and is sufficient to allow consideration of the issue under the plain error doctrine. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). Under the plain error doctrine, we may consider a forfeited issue if a clear and obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error is so serious that it affected the fairness of the trial and undermined the integrity of the judicial process. *People v.*

_____

[3]In *Washington*, the majority also observed, "albeit parenthetically," that had the trial court considered the testimony which the State sought to admit through an offer of proof, *i.e.*, that the perpetrator was described as a "male black wearing a blue coat and black hat" at the time of the crime and the defendant was "a male black who was wearing a blue coat and a black hat" at the time of the stop, such information would still have been insufficient to justify the stop. (Internal quotation marks omitted.) *Id.* at 868. In further *dicta*, the majority opined that this evidence would have been refuted by the defendant's testimony that when he was stopped, he was wearing "a dark blue hat and a blue Chicago Bears 'starter jacket,' " an article of clothing that the majority concluded was "a distinctive and readily discernable item of apparel." (Internal quotation marks omitted.) *Id.* However, because the holding in *Washington* was based on the lack of any evidence of the specific description that the police had before the stop, we need not consider the court's parenthetical findings. *People v. Miller*, 355 Ill. App. 3d 898, 904 n.1 (2005).

*Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the defendant has the burden of persuasion, and if he fails to satisfy this burden, the " 'procedural default must be honored.' " *Walker*, 232 Ill. 2d at 124 (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)).

¶ 53    We first consider whether an error occurred in this case, namely, whether a clear and obvious error resulted when the court convicted defendant of the uncharged offense of home invasion while armed with a dangerous weapon other than a firearm. "A defendant in a criminal prosecution has a fundamental due process right to notice of the charges brought against him." *People v. Kolton*, 219 Ill. 2d 353, 359 (2006). Accordingly, a defendant may not be convicted of an offense with which he was not charged, unless it is a lesser-included offense of the charged crime and "the evidence adduced at trial rationally supports a conviction on the lesser-included offense and an acquittal on the greater offense." *Id*. at 359-60. "Whether a charged offense encompasses another as a lesser-included offense is a question of law, which this court reviews *de novo*." *Id*. at 361 (citing *People v. Landwer*, 166 Ill. 2d 475, 486 (1995)). To determine whether an uncharged offense is a lesser-included offense of the charged offense, a court first "looks to the allegations in the charging instrument to see whether the description of the greater offense contains a 'broad foundation' or 'main outline' of the lesser offense." *Kolton*, 219 Ill. 2d at 361.

¶ 54    Here, the State charged defendant with four counts of home invasion while armed with a firearm in violation of section 12-11(a)(3) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-11(a)(3) (West 2012)). The information specifically alleged that defendant entered the dwelling place of another and "*WHILE ARMED WITH A FIREARM*, HE USED FORCE OR THREATENED THE IMMINENT USE OF FORCE UPON [the victims] WITHIN SUCH DWELLING PLACE ***." (Emphasis added.) Subsection (a)(3) of the home invasion statute requires evidence that the accused knowingly entered the dwelling "[w]hile armed with a firearm." 720 ILCS 5/12-11(a)(3) (West 2012). In contrast, subsection (a)(1) of the statute requires evidence that the accused enters the dwelling "[w]hile armed with a dangerous weapon, other than a firearm." 720 ILCS 5/12-11(a)(1) (West 2012).

¶ 55    After the State presented its evidence, the court determined that the State had proven defendant guilty of home invasion, but had not proven that a firearm was used. The court then convicted defendant of home invasion with a dangerous weapon other than a firearm pursuant to subsection (a)(1). 720 ILCS 5/12-11(a)(1) (West 2012). However, defendant was not specifically charged with an offense under subsection (a)(1) of the home invasion statute. Furthermore, there was no evidence presented at trial to show that at the time of the commission of the crime, defendant was armed with any type of dangerous weapon other than a firearm.

¶ 56    Based on the discrepancy in the charged offenses, defendant argues that his conviction for home invasion with a dangerous weapon is "fatally flawed" for three reasons. First, defendant argues he was never charged with this offense under section 12-11(a)(1) of the Code. Second, the offense of home invasion with a dangerous weapon is not a lesser-included offense of home invasion with a firearm. Third, the court found that no weapon was used, invalidating any conviction of home invasion with a dangerous weapon.

¶ 57    Another division of this court recently considered a similar argument in *People v. Clark*, 2014 IL App (1st) 123494, *appeal allowed*, No. 118845 (Ill. Mar. 25, 2015). There, the State charged the defendant with aggravated vehicular hijacking while armed with a firearm (720 ILCS 5/18-4(a)(4) (West 2010)) and armed robbery while armed with a firearm (720 ILCS

5/18-2(a)(2) (West 2010)). *Clark*, 2014 IL App (1st) 123494, ¶ 1. After a bench trial, the court found the defendant guilty of the uncharged offenses of aggravated vehicular hijacking while armed with a dangerous weapon other than a firearm (720 ILCS 5/18-4(a)(3) (West 2010)) and armed robbery while armed with a dangerous weapon other than a firearm (720 ILCS 5/18-2(a)(1) (West 2010)), "finding that those offenses were lesser-included offenses of the charged offenses." *Clark*, 2014 IL App (1st) 123494, ¶ 1. On appeal, the defendant claimed that the offenses of which he was convicted were not lesser-included offenses of those offenses with which he was charged. *Id.*

¶ 58        In reaching its decision, the *Clark* court reviewed two prior decisions, *People v. McBride*, 2012 IL App (1st) 100375, ¶¶ 24, 26 (finding that a firearm did not constitute a "dangerous weapon, other than a firearm" as defined in the aggravated vehicular hijacking statute because the plain language of the statute "specifically excludes firearms" (internal quotation marks omitted)), and *People v. Barnett*, 2011 IL App (3d) 090721, ¶ 38 (concluding that the offense of armed robbery while armed with a dangerous weapon other than a firearm was not a lesser-included offense of armed robbery while armed with a firearm because "the language of the [armed robbery] statute clearly demonstrates [the two offenses] *** are mutually exclusive of each other"). The court found that, like *McBride* and *Barnett,* "the allegation that defendant was armed with a firearm necessarily excluded an allegation that defendant was armed with a dangerous weapon other than a firearm." *Clark*, 2014 IL App (1st) 123494, ¶ 32. After determining that the charging instrument in *Clark* lacked any language from which "to reasonably infer an allegation that defendant was armed with a dangerous weapon other than a firearm," the court concluded that the uncharged offenses (aggravated vehicular hijacking while armed with a dangerous weapon and armed robbery while armed with a dangerous weapon other than a firearm) were not lesser-included offenses of the charged offenses (aggravated vehicular hijacking with a firearm and armed robbery with a firearm). *Id.* Therefore, the court vacated the defendant's convictions for the uncharged offenses, noting that "the information did not state a 'broad foundation or main outline' of either aggravated vehicular hijacking *** or armed robbery *** [under the respective criminal statutes]. [Citation.]" *Id.* ¶ 34.

¶ 59        We find the legal reasoning in *Clark* compelling and particularly applicable to this case. Like the criminal statutes at issue in that case, the home invasion statute distinguishes between the commission of the offense "with a firearm" from the commission of the offense "with a dangerous weapon, other than a firearm," by ascribing those two factors to different subsections of the statute. See 720 ILCS 5/12-11(a)(1), (a)(3), 18-2(a)(1), (a)(2), 18-4(a)(3), (a)(4) (West 2010). Therefore, the allegation that defendant was armed with a dangerous weapon *other* than a firearm cannot be reasonably inferred from the allegation that defendant was armed with a firearm, because the latter necessarily excludes the former. Because the information charging defendant with home invasion "while armed with a firearm" did not state a "broad foundation" or "main outline" of home invasion while armed with a dangerous weapon other than a firearm, we find that the trial court erred when it convicted defendant of the uncharged offense of home invasion with a dangerous weapon other than a firearm. (Internal quotation marks omitted.) *Clark*, 2014 IL App (1st) 123494, ¶ 34.

¶ 60        We have considered the cases cited by the State and find them distinguishable from the one at bar. See *People v. Washington*, 2012 IL 107993; *People v. Garcia*, 188 Ill. 2d 265 (1999). The State initially argues that *Washington* supports its argument that home invasion while

- 12 -

armed with a dangerous weapon other than a firearm is a lesser-included offense of home invasion while armed with a firearm. In *Washington*, the supreme court held that there was no variance between an indictment charging defendant with offenses " 'while armed with a dangerous weapon, to wit: a firearm' " and the proof at trial showing that defendant committed the offenses "while armed with a dangerous weapon–a gun." 2012 IL 107993, ¶¶ 40-41. It is unclear why the State believes this case supports its position. The question here is not whether there is a variance between the indictment and the proof at trial; the question is whether home invasion while armed with a dangerous weapon other than a firearm is a lesser-included offense of home invasions while armed with a firearm. Moreover, the criminal statutes at issue in *Washington* differed significantly in that they required proof that the defendant "was armed with a dangerous weapon," whereas, here, a violation of subsection (a)(1) requires that defendant be armed "with a dangerous weapon, *other than a firearm*." (Emphasis added.) 720 ILCS 5/12-11(a)(1) (West 2012). We ultimately find *Washington* inapposite to the present case.

¶ 61 The State's reliance on *Garcia* is equally unavailing. There, the defendant was charged with possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 1994)). *Garcia*, 188 Ill. 2d at 267. After the parties rested, the trial court *sua sponte* ordered the jury to be instructed on the lesser-included offense of possession of a controlled substance (720 ILCS 570/402(a)(2)(A) (West 1994)), and the jury found defendant guilty of the lesser-included offense. *Id*. at 269. Our supreme court decided that the trial court could give the jury a *sua sponte* instruction on a lesser-included offense. *Id*. at 269-70, 276. Here, however, the question is not whether defendant's conviction of a lesser-included offense passed procedural muster but, rather, whether defendant was convicted of an act that is in fact a lesser-included offense of the charged offense. In *Garcia*, there was no dispute that possession of a controlled substance was a proper lesser-included offense; here, on the other hand, home invasion with a dangerous weapon is not a lesser-included offense of home invasion with a firearm for the reasons discussed above. *Garcia* is inapplicable.

¶ 62 We lastly note that any suggestion by the State that defendant's challenge to the information requires a showing that he was prejudiced in the preparation of his defense is a mischaracterization of defendant's argument. Defendant does not challenge the contents of the information; instead, he argues that the trial court erred in finding him guilty of an offense with which he was not charged.

¶ 63 We must now consider whether the court's error rises to the level of plain error. Here, defendant contends that the second prong of the plain error doctrine applies, arguing that "convicting a defendant of an uncharged offense that is not a lesser-included offense of the charged offense violates due process and implicates the integrity of the judicial process." See *People v. McDonald*, 321 Ill. App. 3d 470, 472-74 (2001) (finding plain error under the second prong where the defendant was convicted of an uncharged offense that was not a lesser-included offense of the charged offense). The State claims that the second prong of plain error is the equivalent of "structural error" under the federal constitution, which has only been recognized as existing in a limited class of cases, including: a complete denial of counsel; trial before a biased judge; racial discrimination in the selection of a grand jury; denial of self-representation at trial; denial of a public trial; and a defective reasonable doubt instruction. In support, the State cites *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009), and *People v.*

*Thompson*, 238 Ill. 2d 598, 609 (2010), and concludes that convicting a defendant of an uncharged offense does not fall under the limited class of structural errors.

¶ 64    The court in *Clark* also considered this issue, explicitly disagreeing that either *Glasper* or *Thompson* limited the second prong of plain error to the above six categories. 2014 IL App (1st) 123494, ¶¶ 38-40. The court noted that, in *Glasper*, the supreme court considered whether a prosecutor's statements in closing arguments could constitute plain error under the second prong and "did not indicate that prosecutorial misconduct could not be plain error because it was not one of the six types of structural error identified by the United States Supreme Court." *Clark*, 2014 IL App (1st) 123494, ¶ 38. The *Clark* court also observed that, in *Thompson*, the supreme court concluded only that a violation of Illinois Supreme Court Rule 431(b) (eff. May 1, 1997) was not plain error under the second prong because "it did 'not implicate a fundamental right or constitutional protection,' and the defendant failed to show that the error resulted in an unfair trial.' " *Clark*, 2014 IL App (1st) 123494, ¶ 39 (quoting *Thompson*, 238 Ill. 2d at 614-15). The *Clark* court then explained that although *Glasper* and *Thompson* "equated second-prong plain error to structural error, they did not restrict plain error to the six types of structural error that have been recognized by the United States Supreme Court"; further, the Illinois Supreme Court "has held that second-prong plain error applies to errors other than those six errors." *Clark*, 2014 IL App (1st) 123494, ¶ 40.

¶ 65    We agree with *Clark* that the second prong of plain error is not limited to the six types of error that have been recognized by the United States Supreme Court. We, too, thus consider whether defendant's convictions of an uncharged, but not lesser-included, offense resulted in an error "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Piatkowski*, 225 Ill. 2d at 565. We find that such an error occurred. As the *Clark* court noted, "Convicting a defendant of an uncharged offense that is not a lesser-included offense of a charged offense violates a defendant's fundamental due process right to notice of the charges brought against him." (Internal quotation marks omitted.) *Clark*, 2014 IL App (1st) 123494, ¶ 41. We find, as did the court in *Clark*, that the second prong of plain error is triggered by a conviction of an uncharged offense. *McDonald*, 321 Ill. App. 3d at 473-74. Accordingly, we reverse defendant's convictions and sentences for home invasion while armed with a dangerous weapon.

¶ 66                              C. Sufficiency of the Evidence

¶ 67    Having vacated defendant's convictions and sentences for home invasion, we now determine whether the State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt of robbery, attempted robbery, and unlawful restraint. Defendant contends that the State failed to meet its burden of proof because the witness identifications were unreliable. He argues that only two of the four witnesses identified him as the offender and that those witnesses had an obstructed view of the offender. He also challenges the accuracy and reliability of the offender descriptions.

¶ 68    The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When considering a challenge to the sufficiency of the evidence, it is not our function to retry the defendant; it is the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from the facts. *Id*. at 228. We will only reverse a conviction if the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 69    As an initial matter, we note that the trial court specifically found that the four occurrence witnesses were "very credible" and that their testimony was "unimpeached" and "reasonably consistent with each other." The court even went so far as to remark that Calvin was an "extraordinarily credible witness" who sought to be "careful and accurate" when reporting her account of the incident and description of the offender. A reviewing court will not substitute its judgment for that of the trier of fact on issues of witness credibility or the weight of the evidence. *Siguenza-Brito*, 235 Ill. 2d at 224-25. We further find it notable that the trial court acknowledged that the reliability of the identification testimony could be challenged if the circumstances demonstrated that the show-up was "suggestive"; significantly, the court pointed out that the "witnesses were clear that Officer Felker *** never at any time said the police were the ones that tried to create an identification or tried to suggest an identification."

¶ 70    Generally, identification by a single witness is sufficient to support a conviction if the defendant is viewed under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995); *People v. Gabriel*, 398 Ill. App. 3d 332, 341 (2010). In assessing the reliability of a witness identification, the following well-established factors are to be considered: (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

¶ 71    Rusnak and Calvin both had sufficient opportunity to view defendant with a reasonable degree of attention. The record shows that the attack occurred in the middle of the day and there is no evidence that the house or kitchen were dark or unlighted. Rusnak said he had several minutes, "[f]ive, ten minutes," to observe defendant as he entered the kitchen, held a gun on Komperda, and demanded money from everyone. At one point, he was standing within arm's reach of defendant. Calvin also testified that she "made sure [she] had gotten a good look" at the offender's face. Both witnesses had sufficient time and opportunity to observe defendant with a reasonable degree of attention during the incident. See *People v. Herrett*, 137 Ill. 2d 195, 204 (1990) (finding that an eyewitness had a sufficient opportunity to see the defendant where the witness observed the defendant's face for "several seconds"); *People v. Negron*, 297 Ill. App. 3d 519, 530-31 (1998) (finding no reasonable doubt where the witnesses identified the defendants after viewing their attackers for "not *** more than several seconds").

¶ 72    Moreover, both Rusnak and Calvin gave similar and consistent descriptions of the offender prior to identifying him in person at the show-up. Rusnak testified that he described the offender to the police as "slightly taller" than him with hair that was just above shoulder-length, wearing a white T-shirt and Calvin testified that she described the offender to the 9-1-1 operator as a "young black man with a white t-shirt and neck tattoos." The police officers received a description from Rusnak at the house before they detained defendant and the description matched the defendant when he was stopped by the police only a few blocks from the scene of the crime. At the show-up, Rusnak and Calvin positively identified defendant as the offender. Later at trial, both witnesses identified defendant in open court.

These descriptions were not rebutted by any other witness's testimony. Although Komperda and Plewa could not identify defendant in person during the show-up, neither of them testified that defendant could not have been the offender and both recalled the perpetrator being a black male with a tattoo on his neck.

¶ 73     Furthermore, both Rusnak and Calvin identified defendant as the offender within a short period of time after the crime occurred. Calvin testified that she identified defendant as the offender less than five minutes after she had seen him in her kitchen. Officer Felker testified at trial that he and his partner heard the robbery call over the radio at approximately 12:45 p.m. when they were not "too far away" from the address. They then went to the scene, where they received a description of the offender and at approximately 12:53 p.m. "and 51 seconds," Felker radioed "OEMC" to report that they had detained a possible suspect, *i.e.*, defendant, three blocks away from Calvin's home. Finally, the record gives no indication that either Rusnak or Calvin ever expressed doubt that defendant was the offender.

¶ 74     Rusnak and Calvin's identification of defendant is further supported by Komperda's testimony that he recognized defendant's voice as the voice of the offender who was in the house. Komperda was with the offender for the longest period of time. Not only did Komperda claim he "clearly exactly heard [the offender's] voice" as the offender stood next to him holding a gun to his head, but Komperda even recalled, when identifying defendant's voice, that it was "specific" and a "squeaky kind of voice, childish voice"–like that of the offender.

¶ 75     Defendant argues that Komperda and Plewa–the two witnesses that did not positively identify him as the offender–had the best opportunity to observe the offender and that it is "counter-intuitive that the witnesses who had the best opportunity to view the offender did not identify [defendant] as such, while those who saw the offender least did identify him." However, defendant cites no legal authority in support of his contention. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); see also *In re Marriage of Johnson*, 2011 IL App (1st) 102826, ¶ 25 (noting it is "well settled that *** bare contentions that fail to cite any authority do not merit consideration on appeal"). Moreover, identification by a single witness is sufficient to support a conviction if the defendant is viewed under circumstances permitting a positive identification (*Lewis*, 165 Ill. 2d at 356; *Gabriel*, 398 Ill. App. 3d at 341), and here, as we discussed above, both Rusnak and Calvin identified defendant as the offender under circumstances permitting a positive identification. Accordingly, defendant's argument fails.

¶ 76     Defendant's argument also relies heavily on the fact that none of the witnesses told police that the offender had a facial tattoo or a stutter, both of which he allegedly had at the time of the incident. This argument is not persuasive. "[C]ourts have consistently recognized that vague or discrepant descriptions do not necessarily render identifications unreliable, because very few witnesses are trained to be keen observers." *People v. Dereadt*, 2013 IL App (2d) 120323, ¶ 23. See *People v. Williams*, 118 Ill. 2d 407, 413-14 (1987) (witness's failure to mention the defendant's facial hair did not render her identification unreliable); *People v. Nims*, 156 Ill. App. 3d 115, 120-21 (1986) (victim's failure to mention the defendant's facial scars did not render her identification unreliable); *People v. Bias*, 131 Ill. App. 3d 98, 104-05 (1985) (inaccuracies regarding the "presence or absence of a beard, mustache, or tattoo *** do not render an identification utterly inadmissible"). Moreover, the trial court in this case directly addressed the defense argument about the lack of description involving a facial tattoo. While acknowledging that both sides had stipulated to a description of defendant's various tattoos, including a facial tattoo that contained the word "SOX," the court stated that it did not observe

- 16 -

"any tattoos visible on [defendant's] face" during the course of the trial and that defendant's tattoos were not "something so unique and out of the ordinary that failure of the witness to observe them" would compromise the witness's testimony.

¶ 77   We find no reason to disregard or discredit the trial court's assessment of the witnesses' credibility and the reliability of their testimony. Viewing the evidence in the light most favorable to the prosecution, we cannot say that the identifications were so unreasonable, improbable, or unsatisfactory that they raise a reasonable doubt of defendant's guilt. We find, therefore, that the State presented sufficient evidence to sustain defendant's convictions.

¶ 78                                D. Sentencing Issues

¶ 79   Because we are vacating defendant's convictions and sentences for the home invasion counts, we need not reach his arguments that the 15-year sentences were excessive and that three of the four convictions and sentences for home invasion should be vacated under the one-act, one-crime doctrine. Instead, we remand this cause to the trial court for sentencing on defendant's unlawful restraint convictions, which were previously merged into the home invasion counts.

¶ 80                          E. Correction of the Mittimus

¶ 81   Defendant asks that the mittimus, which currently reflects five-year prison sentences for his attempted robbery convictions, be corrected to reflect the trial court's oral pronouncement of three-year prison sentences for these convictions.[4] The record shows that the trial court did impose three-year prison sentences for the attempted robbery convictions. A trial court's oral pronouncement is the judgment of the court and a written order of commitment is "merely evidence of that judgment." *People v. Jones*, 376 Ill. App. 3d 372, 395 (2007). Where a conflict exists between the two, the oral pronouncement controls. *Id.*; see also *People v. DeWeese*, 298 Ill. App. 3d 4, 13 (1998) (correcting the mittimus to reflect the proper offense for which the defendant was convicted). We agree that the mittimus should be corrected to reflect a three-year sentence for each of defendant's attempted robbery convictions. Because the trial court will need to issue a new mittimus upon sentencing for defendant's unlawful restraint convictions, we direct the court on remand to correct the sentencing term for defendant's attempted robbery convictions.

¶ 82                                III. CONCLUSION

¶ 83   We affirm defendant's convictions and sentences for robbery, attempted robbery and unlawful restraint and reverse his convictions and sentences for home invasion while armed with a dangerous weapon other than a firearm. Because defendant was not sentenced on his unlawful restraint convictions, as those were merged into the home invasion convictions at sentencing, we remand this matter for sentencing on the unlawful restraint convictions and further direct the court to issue a corrected mittimus reflecting the three-year sentences for attempted robbery.

---

[4]During the sentencing, the trial court clarified that "Counts 7 through 9 would be findings of guilty of attempt robbery as opposed to what [the court] originally said was an attempt aggravated robbery."

¶ 84          Affirmed in part and reversed in part.

¶ 85          Cause remanded with directions.